THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HORACE HUNTER, Defendant-Appellant.

First District (5th Division)   No. 83—2316

Opinion filed November 30, 1984.

PINCHAM, J., dissenting.

James J. Doherty, Public Defender, of Chicago (Hugh Stevens, Assistant

Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Jeanette Sublett, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial in which he was found guilty of taking indecent liberties with a child (Ill. Rev. Stat. 1981, ch. 38, pars. 11—4(a)(2), (a)(3)), defendant was sentenced to five years' imprisonment. He appeals, contending that his guilt was not established beyond a reasonable doubt.

We affirm, and pertinent to our disposition are the following:

The victim, D.J., a nine-year-old boy, testified that he lived with his mother, two sisters and his mother's boyfriend; that on March 30, 1983, he fell asleep on the couch in the living room after watching defendant do some card tricks; that his mother awakened him and sent him to bed at about 8 p.m.; that he went to his bedroom and lay down on his bed fully clothed and fell asleep on top of the covers. He woke up when the defendant came in, but fell back asleep. Defendant woke him up again and took his clothes off, including his underpants. Then defendant took off his own clothes and got into bed with him, holding him close to him with one hand on his mouth and the other around his waist. Defendant then tried to put his "thing" in his butt. For the next 15 minutes he felt the defendant's hard "thing" by his butt, and the defendant kissed him on the side of his jaw five times. He noticed alcohol on defendant's breath. After about 15 minutes, the defendant got up and went to the adjoining bed, which was 18 inches away, and fell asleep. D.J. further testified that when he became sure that the defendant was asleep, he got up and went to the bathroom. Then he went to his mother's bedroom, which was 15 feet away, and told her that the defendant took off his socks, shirt, pants and underpants and tried to put his "thing" in his butt. She told him to lie down, and, after she thought about it, she got up and went to the telephone across the street and called the police. There are no doors on D.J.'s bedroom or his mother's bedroom. He admitted that he made no attempt to stop the defendant's actions, nor did he object to defendant's undressing him, nor did he fight him off when the defendant attempted to put his "thing" into his butt. He admitted the defendant never threatened him. He also admitted he was angry with the defendant for his refusal to teach him a card trick.

D.J.'s mother substantially corroborated his testimony, adding that the defendant is a brother of her boyfriend and that he had just

come in from Memphis to seek a job. She was in her bedroom with her boyfriend when D.J. came in and related the occurrence. She stated that it took several moments for her to awaken and understand the full meaning of what her son had said, then she called the police. She took D.J. to the hospital for examination. It was stipulated that there were no visible injuries to him.

Defendant testified on his own behalf that when he entered the bedroom and saw D.J. sleeping in his clothes he woke him and told him to take his clothes off; that D.J. took all but his underwear off and got under the covers; that he then undressed himself and went to sleep in the adjoining bed after he finished smoking his cigarette. He was later awakened by the police and denied doing anything. He admitted that he had three or four shots of whiskey that night.

OPINION

Defendant contends now, as he did in the trial court, that he was not proved guilty beyond a reasonable doubt, and that the evidence was not clear and convincing nor sufficiently corroborated.

He urges this court to place itself in the position of reviewing the factfinder's determination of the credibility of the witnesses. He points to discrepancies in the testimony of D.J. and his mother and his own testimony. He maintains that D.J. first said that defendant stuck his "thing" in his butt, but later said he attempted to stick his "thing" in his butt. He further notes that D.J. did not cry out or struggle to avoid the act and that the medical report did not indicate any trauma from the purported act.

Our supreme court has held that force is not material to the offense of taking indecent liberties with a child and that acquiescence or failure to resist is no defense to such a charge. (See *People v. Guertin* (1930), 342 Ill. 99, 104, 173 N.E. 824.) Even consent by the victim is irrelevant (*People v. Mullen* (1980), 80 Ill. App. 3d 369, 379, 399 N.E.2d 639), and anal penetration is not necessary to secure a conviction (*People v. Oliver* (1976), 38 Ill. App. 3d 166, 170, 347 N.E.2d 865).

Defendant maintains that because the victim D.J.'s testimony was not clear and convincing nor sufficiently corroborated it was not sufficient to sustain his conviction.

We disagree with defendant's contention. It is well established that it is for the trier of fact to determine the credibility of witnesses and the weight to be given their testimony, and where the evidence is conflicting a court of review will not substitute its judgment for that of the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d

733.

The trial court here observed that D.J. was a nine-year-old boy; that the defendant was a grown man; and that D.J. promptly told his mother of the defendant's conduct. Before permitting him to testify, the trial judge examined D.J. as to his understanding of the importance of the oath which he was asked to take and the obligation to tell the truth, and the judge concluded that he was competent. The trial court observed the demeanor and heard the testimony of all the witnesses, considered the forensic evidence, and concluded that the State's evidence was sufficient to prove defendant's guilt. Our review of the record does not disclose any basis to indicate that the trial court's evaluation was erroneous.

The cases relied upon by defendant are distinguishable. *People v. Kolden* (1962), 25 Ill. 2d 327, 185 N.E.2d 170, involved a complainant who reported the indecent act the day after it allegedly happened but denied the act the same day; she testified that defendant touched her "privates," but admitted on cross-examination that she did not know what "privates" meant, nor did she know where defendant had placed his hand. In *People v. Morgan* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063, the complainant waited two days to report an alleged indecent act, told several inconsistent versions to different people at different times, and, according to her schoolteacher, had a history of telling wild stories. The court there concluded: "Where the complainant's testimony is substantially impeached by prior inconsistent statements and a history of fabrication, we will not sustain a conviction based on other testimony which is at best speculative." (69 Ill. 2d 200, 208.) By contrast, D.J.'s testimony here was plausible, straightforward and consistent. A reading of this record which finds circumstances similar to *Kolden* or *Morgan* is, in our view, fanciful.

The judgment of the circuit court of Cook County is therefore affirmed. Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for the State's defending this appeal and incorporate it as part of our judgment.

Affirmed.

MEJDA, P.J., concurs.

JUSTICE PINCHAM, dissenting:

It is the province of the trier of fact to determine the credibility of witnesses and to weigh the evidence. It is likewise the duty of this

court to review the evidence, and, if it is improbable, unsatisfactory or insufficient to establish a defendant's guilt beyond a reasonable doubt, to reverse the conviction. A review of the evidence in this case reveals that it is improbable, unsatisfactory, unclear and unconvincing, uncorroborated and unsubstantiated and does not establish the defendant's guilt of indecent liberties with a child beyond a reasonable doubt. I therefore dissent. The complete pertinent testimony of the three trial witnesses follows.

D.J. testified on direct examination that he was nine years old, in the fourth grade and on March 13, 1983, he lived at 901 West 51st Street with his mother, father, two sisters and Horace Hunter, the defendant. On that evening he was asleep on the living room couch, and about 8 o'clock his mother woke him up, he went into his bedroom and went to sleep. He did not undress before he went to sleep. There were two beds in the bedroom, and Horace slept in one of them and he slept in the other. After he went to sleep, the next thing he remembered was that Horace came into the room and woke him up. He went back to sleep. He was still dressed. Horace woke him up a second time and took off his socks, shirt, pants and underpants. Horace was dressed at that time, and Horace then took off his own clothes:

"Q. When Horace took off his clothes what, if anything, did Horace do next?

A. He put his thing in my butt. He tried to.

Q. Now, were you in bed at the time that Horace took off your clothes?

A. Yeah.

Q. Did Horace, when he did that to you, get into your bed or did you get into his bed?

A. Mine.

Q. And when you say Horace put his thing, tried to put his thing into your butt, what, if anything, did he do? How did he get into your bed to do that? Explain it to the Court.

A. He held my mouth and did like this and put his hand under my waist."

When Horace had his hand over D.J.'s mouth and his other hand over his stomach, he felt something at his butt. It felt like "his thing and it was hard." He was in that position 15 minutes. Horace kissed him five times on the jaw, and he noticed that Horace had liquor on his breath:

"Q. When Horace finished this 15 minutes that you are talking about, what, if anything, did Horace do?

A. Got up.

* * *

Q. Where did Horace go?

A. In his bed.

Q. Is that the other bed in the room?

A. Yes.

Q. And what did you do?

A. I waited until he went to sleep.

Q. When he fell asleep, what did you do?

A. Got up and went to the bathroom.

Q. After you went to the bathroom, where did you go?

A. I told my mother."

His mother was in another room in the apartment and he told her that Horace took off his socks, pants, shirt, underwear and tried to put his thing in his "butt":

"Q. And what did your mother do after you told her that?

A. She told me to lay down and she thought about it.

Q. Where was that?

A. She thought about it. She got up."

She went to the telephone booth, and shortly thereafter the police came and Horace was arrested.

D.J. testified on cross-examination that Horace Hunter was his father's brother. Horace didn't normally live with them, and he was only there for about three days. He, D.J., did not normally sleep in that room alone. His sister usually slept there with him, but Horace was sleeping in his sister's bed at that time:

"Q. Is there any door on this bedroom?

A. No.

Q. And your mother and father sleep in a bedroom close to your bedroom, is that right?

A. Right.

Q. Is there any door on their bedroom?

A. No.

Q. How many feet would you say the door of your bedroom is from the door of your parents' bedroom?

A. About 15.

Q. Is there any curtain on your bedroom door?

A. Curtain?

Q. Curtain like on a window. Is there any curtain or something hanging over your parents' bedroom?

A. (Shaking head.)"

Right after supper, Horace showed D.J. and his sister card tricks

played with three cards, and they had to guess what card Horace was trying to hide from them. Horace hid the card and he could never find it. Horace let his sister find the card, and he asked Horace to show him the trick. Horace said he was not going to show him the trick. D.J. didn't like that, and he was mad at Horace.

After Horace showed him the card tricks, the adults played cards and he fell asleep. His mother told him to go to his bedroom, which he did, and he fell asleep on his bed. When Horace came into the bedroom, he first tried to wake him up. He got up but Horace thought he was asleep. Horace did not tell him to take his clothes off; Horace took them off:

"Q. When Horace was taking your clothes off, did you ever say to Horace not to do it?

A. No.

Q. Did you ever tell Horace to stop it?

A. No.

Q. Did you ever yell out for your mother?

A. I couldn't, he was holding my mouth.

Q. And now you say he had his hand over your mouth, is that right?

A. Right.

\* \* \*

Q. Did he make you take your clothes off?

A. Um-hmm.

Q. He took them off himself, right?

A. Right."

Once Horace took D.J.'s clothes off, Horace then took his clothes off. Horace was standing on the floor when he took his clothes off. He used both his hands to take his clothes off, during which Horace did not have his hands over D.J.'s mouth. Horace did not threaten him at that time. After Horace took off his clothes, he got back in bed with D.J. and tried to put his penis in his "butt."

D.J. remembered testifying in another courtroom downstairs on April 15 of this year:

"Q. Do you remember—page 10 and 11—do you remember a State's Attorney asking you this question: 'What happened while you were in the bedroom that day?'

A. Yes.

\* \* \*

MR. GOLNEWICZ: Further down you answer, 'He took off my socks and my pants and my shirt and he took off my underclothes. Then he put his penis in my butt.'

A. Yes."

At trial D.J. said that he told his mother that Horace "tried" to put his penis in his butt. When Horace tried to put his penis in his butt, he did not cry out. He did not ask his mother or his father for help. Horace did not threaten him nor tell him not to tell anybody. D.J. testified further:

"Q. When Horace was trying to put his penis in your butt, as you say, did you try to fight him off or anything like that?

A. I turned around.

\* \* \*

Q. How long was Horace's penis in your butt?

MR. KLAPMAN: Objection.

THE COURT: Overruled.

THE WITNESS: About 20 minutes."

After he told his mother, the police came and took him to the hospital where he was examined by a doctor.

D.J.'s mother testified on direct examination that on March 30-31, Horace Hunter was staying at her house. Horace Hunter, her boyfriend's brother, had been staying there for three days. He came from Memphis, Tennessee, had no place to stay, and he was sleeping in the room of D.J. and his sister. There were two beds in the room, one for D.J. and one for his sister. Horace was staying in the bed of D.J.'s sister.

At approximately 10:30 or 11 that night she, her boyfriend and Horace had been drinking and playing cards. After they finished playing cards, Horace left, went in the room and said he was going to bed. Her daughter was not staying in the bedroom at that time; she was on the couch. At about midnight D.J. came into her bedroom. Her boyfriend, Frederick Hunter, was in the bedroom when D.J. came in. D.J.'s mother testified:

"Q. Now, when D.J. came in what did [he] tell you?

A. He woke me up and said he didn't want to sleep in that room no more.

Q. What happened next?

A. And I asked him why. He said Horace tried to do something to him. Then I asked him what did he try to do? He said he pulled off his socks and pulled off his pants and blouse—I mean his shirt and took—he said his thing and put it in his butt.

Q. Did he say anything else to you about what Horace did?

A. And then he said—and I asked him what else did he do? And he said kissed him five times on the jaw.

Q. What did you do after D.J. told you that?

A. Well, when he told me, you know, when he woke me up I was kind of half sleep and half woke. I really didn't pay no attention to it. I laid back down and then I thought of what he said and I got up and I told my old man and I told my son, and I told him stay in the room and don't come out of the room. I was going to call the police. That's what I did."

D.J.'s mother went across the street to a tavern. D.J. stayed with Frederick when she went to call the police. She returned to the apartment and the police arrived. She took D.J. to Englewood Hospital.

D.J.'s mother testified on cross-examination that the bedroom that she and Frederick slept in did not have a door, and there was no door to the bedroom in which Horace and D.J. slept. Her bedroom door is about 15 feet from Horace's and D.J.'s bedroom door. D.J. was not crying and she didn't know if he was in pain when he first came to her; he just came in and woke her up. D.J. never said that Horace "stuck his thing in his butt."

D.J.'s mother testified at the preliminary hearing on April 15:

"Q. Did someone ask you this question and did you give this answer:

'Q. Whose drawers were on?

A. My son. And said he pulled them down in the back and stuck his penis in him.'

Q. Did you give that answer to that question?

A. They must have wrote it down in the wrong way, but he said he tried to.

Q. But then you are saying that you did not give that answer?

A. I might have gave the answer."

Horace Hunter, the defendant, testified on direct examination that he lived at 2682 McDonald in Memphis with his mother, "his lady," and his two children. He recently came to Chicago. He received a phone call from his brother, who told him that there were going to be job openings in Chicago and he asked if he could come up. Hunter arrived on Monday, March 28, 1983, and stayed with his brother at 901 West 51st Street, where D.J.'s mother, her two little kids and D.J. lived. On Tuesday and Wednesday, Hunter and his brother, Fred, went looking for a job. They did not have any luck, and they returned to the apartment about 5 p.m. D.J.'s mother and her kids were there when they returned. Later, Fred and D.J.'s mother went to the store, and they were gone between 45 minutes and an hour. When they came back they set out the groceries and had supper.

After supper Horace showed D.J. and his sister a card trick, three-card molly. The object of the game was to find one card among three. Horace teased D.J.; Horace would throw the card and wouldn't let D.J. find it, but he would let his sister find it. D.J. asked Horace to show him the trick, but Horace would not do so and D.J. could not find the card. D.J. seemed to be angry. D.J.'s mother came over and said, "Cut out playing and let's get down on some spade, 3-handed spade." The three adults played spades. They started about 8 and played up until about 11 or 12 o'clock. They were drinking from a fifth of G&J Brandy and a six-pack of beer. Over the three-hour period they did not drink "half of it."

After the adults finished playing cards, D.J.'s mother and Fred said they were going to turn in and asked Hunter to lift out the couch and "turn the kids in." D.J.'s sister was sleeping on the couch. D.J.'s mother told him, Horace, to wake D.J. up and "turn him in."

Hunter went out to the porch, smoked a cigarette and came back into the bedroom where he and D.J. were staying. D.J. was lying on the bed on top of the covers fully clothed. Hunter shook D.J. and told him to take off his clothes. D.J. said there was a knot in his tennis shoe and asked Hunter to take it out, which Hunter did. D.J. took off his clothes. Hunter did not take off any of D.J.'s clothes. D.J. took off his own clothes down to his underwear and got back in the bed, under the cover.

There were two beds in the bedroom, about 18 inches apart. There was no door on the bedroom, just an opening. Hunter's brother, Frederick, and D.J.'s mother slept in another bedroom, which was about six to nine feet from Hunter's bedroom door. There was no door on that bedroom either, just an open doorway.

After D.J. went to bed, Hunter sat on his bed, smoked the rest of his cigarette, took off his clothes, lay down and went to sleep. The next thing he remembered, "the police bust in, had the flashlight and throwed the gun on me and told me I was under arrest." Hunter stepped out of the bedroom and asked D.J.'s mother what was the problem. Hunter testified he did not sexually assault, hit or try to lewdly fondle D.J.

On cross-examination the defendant, Horace Hunter, testified that he drank about three or four shot glasses of whiskey; that D.J. got up and "took all of his clothes off himself"; that within the last 10 years he had been in the penitentiary in Tennessee for burglary.

The following stipulation was presented:

"MR. GOLNEWICZ: Judge, there will be a stipulation by and between the parties of a medical examination by Dr. Lee, which

is memorialized in a three-page report \*\*\*. What in essence this medical report does say is on March 31st this year at approximately 12:35 in the morning a Dr. Lee examined D.J. After taking various vital statistics under his physical findings, treatment and time he finds no bruises, chest is clear, soft, flat rectal, no bruises, no lacerations. So stipulated?

MR. KLAPMAN: So stipulated."

On this evidence the trial court found, "The record amply supports a finding of guilty of attempt of anal intercourse which constitutes indecent liberties with a child."

In *People v. Morgan* (1977), 69 Ill. 2d 200, 370 N.E.2d 1063, following a bench trial the defendant was convicted of taking indecent liberties with a nine-year-old child. A divided appellate court reversed the conviction on the grounds that the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt. On the State's request for leave to appeal, our supreme court affirmed the appellate court's reversal. In *Morgan*, the mother of the child-victim testified that the defendant visited them in their home shortly after supper, that the defendant drank a "beer or two" with the victim's mother and her husband, while the victim played and watched T.V. The mother testified further that the defendant fell asleep on the sofa and that she later sent the child-victim to bed. Because she could not awaken the defendant she left him asleep on the sofa. She and her husband then went to bed. The following morning, when she arose, the defendant was gone. It was during the night, the victim-child testified, that the defendant entered her bedroom, awakened her and took her in the living room, pulled down her underpants and kissed her on her "crotch." The victim later felt a burning and itching sensation in her vaginal area and her grandmother testified that the area was red and irritated. The defendant denied the allegations and denied being at the victim's home on the date of the alleged offense. The trial judge held that the testimony of the victim's grandmother was corroboration and specifically stated that it "believed the testimony of the little girl and particularly the mother of this little girl in this situation," strikingly similar to the trial court's statement in the case at bar. The State argued in *Morgan*, as the State argues in the case at bar, that the victim's testimony "was clear and convincing as well as corroborated, and that the question of the witness' credibility was one for the trial court." In affirming and holding that the appellate court properly reversed the defendant's conviction, our supreme court stated, in language most applicable to the case at bar:

*"Contrary to the State's contention, the complainant's testi-*

*mony was neither clear and convincing nor substantially corroborated, as required in cases of this nature.* [Citations.]

* * *

While due weight must be given to the trier of fact as to the credibility of the witnesses, '*it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged.*' [Citations.]

The only corroborative evidence supporting the complainant's testimony was that of her parents and the grandmother, neither of which constituted substantial corroboration. The parents' testimony merely placed the defendant in their trailer home on March 14. Although this testimony constituted some corroboration, in *People v. Kolden* (1962), 25 Ill. 2d 327, [185 N.E.2d 170], * * * this court held that merely placing the defendant in the house with the complainant was not, alone, sufficient corroboration to sustain a conviction where the complainant's testimony was otherwise unconvincing.

* * *

*While we are cognizant of the difficulties in adducing proof in cases of this type, this does not vitiate the traditional requirement of proof of guilt beyond a reasonable doubt.* [Citations.]" (Emphasis added.) *People v. Morgan* (1977), 69 Ill. 2d 200, 206-208.

In *People v. Nunes* (1964), 30 Ill. 2d 143, 195 N.E.2d 706, the jury found the defendant guilty of taking indecent liberties with a 12-year-old girl. The defendant contended on review that the testimony of the victim and her 12-year-old girlfriend that the defendant prevailed upon the victim to sit on his lap, and thereafter put his arm around her, kissed and fondled her and induced her to touch his private parts was insufficient to establish his guilt beyond a reasonable doubt. Our supreme court agreed and, in reversing the conviction, held:

"It is axiomatic that a charge of indecent liberties is an accusation easily made, hard to be proved, and harder to be defended by the party accused. [Citations.] *In such cases reviewing courts are especially charged with the duty of carefully examining the evidence,* and while due weight must be given to the judgment of the jury as to the credibility of the witnesses, *it is our duty to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged.* In our opinion the testimony of the two girls was not

sufficient to remove all reasonable doubt as to the defendant's guilt.

\* \* \*

It cannot be said in the face of the contradictions and the improbabilities in the testimony of the two girls that the evidence creates an abiding conviction of the defendant's guilt." (Emphasis added.) *People v. Nunes* (1964), 30 Ill. 2d 143, 146-47.

In *People v. Kolden* (1962), 25 Ill. 2d 327, 185 N.E.2d 170, as in the case at bar, the victim was nine years of age and the defendant was found guilty by the court of taking indecent liberties with a child. On review he contended for reversal that the evidence failed to establish his guilt beyond a reasonable doubt. In *Kolden*, the victim testified that the defendant told her to touch his private parts, but the conversation was interrupted when the defendant answered her brother's knock at the bathroom door. The victim testified that later that day in the bedroom the defendant "put his finger in my private." The defendant testified and denied the misconduct attributed to him. In reversing, our supreme court held:

> "*It is well settled in Illinois that where a conviction for taking indecent liberties with a child depends on the testimony of the prosecuting witness, and the defendant denies the charge, there must be substantial corroboration of her testimony, or the testimony must be otherwise clear and convincing.* [Citations.]
>
> \* \* \*
>
> *We think it clear that in the absence of substantial corroboration, the testimony of this 9-year-old prosecutrix is not so clear and convincing as to sustain a conviction.* The State does not deny the need for corroboration \* \* \*.
>
> \* \* \*
>
> *While we are cognizant of the difficulties in adducing proof in cases of this type, and the susceptibility of small children to confusion upon cross-examination, the very odium and prejudice arising from such a charge requires that the courts do not vitiate the traditional requirement of proof of guilt beyond a reasonable doubt.* From the record before us we are convinced that the State has failed to sustain this burden." (Emphasis added.) *People v. Kolden* (1962), 25 Ill. 2d 327, 329-30, 185 N.E.2d 170.

In the case at bar, the trial judge did not accommodate his finding with specific designations of the record which he found "amply support[ed]" the guilty finding, and my diligent search of the record fails to reveal it. In the case at bar not one iota of corroborative evidence

of D.J.'s testimony was presented. In fact, in those instances in which corroborative evidence would have certainly occurred, no such corroborative evidence was presented or existed. The absence of such corroborative evidence creates a reasonable doubt of guilt. Moreover, the State's evidence is so improbable, unsatisfactory and bizarre that it creates a reasonable doubt of guilt. Further, the defendant's testimony that D.J. was angry with him is not only uncontradicted, but in fact it is corroborated by D.J.'s testimonial admission that he was angry with the defendant.

The act of attempted anal intercourse with D.J. purportedly occurred in D.J.'s open-door bedroom, within a few feet of his mother's open-door bedroom. D.J. knew his mother was within easy hearing distance. Yet, there was no outcry by him to his ever-protective guardian. D.J. did not actually testify that the defendant held his hand over his mouth during the contended 15- or 20-minute effort, and his testimony of his inability to yell, scream or make a single outcry to his mother during the entire episode that he relates is unconvincing.

D.J. did not "promptly" tell "his mother of the defendant's conduct" as the majority states. D.J.'s testimony was that after the purported anal intercourse attempt, he waited for the defendant to go to sleep. He was not asked, he did not testify, and the evidence does not reveal how long he ostensibly waited for the defendant to go to sleep.

D.J. testified that he went to the bathroom, after he waited for the defendant to go to sleep. There is not one scintilla of evidence in this record to reveal the location of the bathroom, with relation to D.J.'s bedroom or his mother's bedroom or otherwise. Whether D.J. went away from, toward or by his mother to get to the bathroom from his bedroom is undisclosed. More importantly, there is no evidence of the length of time D.J. remained in the bathroom, for what reason he went there, or what he did while there.

The evidence is that D.J. went to his mother's bedroom from the bathroom, and in response to several inquiries from his mother, he told her that the defendant had committed acts which constituted attempted anal intercourse. D.J. was not asked and did not testify to his physical or emotional state at that point. His mother testified, however, that D.J. was not crying and she did not know if he was in pain when he came in her bedroom. This testimony was elicited on cross-examination, and she was not otherwise asked nor did she otherwise testify to D.J.'s physical or emotional state.

D.J.'s testimony was that the defendant completely disrobed him. Yet, neither D.J. nor his mother was asked, nor did either testify and

the record is completely silent on, whether D.J. was nude when he ostensibly reported the alleged incident to his mother. D.J. was not asked, he did not testify and the record is silent on whether D.J. remained nude or put on some clothing after the episode which he related and before he told his mother about it. Fleeing nude to his mother would have been at least corroborative of his having been disrobed.

D.J.'s testimony that the incident related by him took place in his bed, over a 15- to 20-minute interlude, during which he was unable to scream because the defendant had his hand over his mouth, coupled with the defendant's unsuccessful efforts to insert his penis in D.J.'s anus, would indicate some degree of struggle in D.J.'s bed. Yet, there is not one descriptive testimonial word in this record of the condition of D.J.'s bed after this specious act. This, too, would have been corroborative evidence.

D.J. testified that the defendant was completely disrobed and was nude when he committed the unauthenticated acts D.J. attributes to him. Yet, D.J. was not asked and did not testify whether the defendant put on any clothing, underwear or sleeping apparel after the incident. Nor was D.J., his mother or the arresting officer asked and neither testified whether the defendant was nude when the officer awakened and arrested him. This, too, would have been corroborative of D.J.'s testimony.

D.J. was promptly examined by a physician. The medical examination would be expected to corroborate D.J.'s testimony of a 15- to 20-minute forcible attempt at anal intercourse with a "hard" penis. But it did not do so. The defense presented, by stipulation, the doctor's examination of D.J., which was that D.J. had a "soft, flat rectal, no bruises, no lacerations." Even a slight tenderness in D.J.'s rectal area seemingly would have been present to corroborate D.J.'s testimony, but no such evidence was presented. Thus, the testimony of the "forensic scientists" does not substantiate the trial judge's guilty finding. Rather, it lends itself to the defendant's innocence.

D.J.'s testimony is bizarre, improbable and unconvincing. The defendant's testimony that D.J.'s mother asked him to "turn the kids in" on the other hand is uncontradicted. Moreover, it is nothing less than preposterous and unpersuasive that the defendant, with knowledge that D.J.'s mother and his own brother were in an adjoining, open-door room only a few feet away, forcibly disrobed D.J., then completely disrobed himself, got in D.J.'s bed and for 15 to 20 minutes forcibly but unsuccessfully attempted to insert his erected penis in this young lad's anus, while successfully restraining him from mak-

ing an outcry. Thereafter, according to the State, the defendant promptly got in his bed only a few feet from D.J.'s bed and there slept until the police arrived and arrested him.

In *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, it was the bizarre testimony of the victim that the defendant forcibly and against her will had sex with her and thereafter drove her home that created a reasonable doubt of the defendant's guilt. In reversing the rape conviction, the court held, in language most applicable to the case at bar:

> "A reviewing court will not hesitate to reverse a conviction where, after a review of all the evidence, there exists a grave and substantial doubt as to the guilt of the defendant due to a lack of credible evidence or the existence of improbable or unsatisfactory evidence." 76 Ill. App. 2d 135, 141, 221 N.E.2d 801.

In *People v. Szybeko* (1962), 24 Ill. 2d 335, 181 N.E.2d 176, it was, in part, the unique and unusual testimony of the sex victim that, after beating and raping her, the defendant drove her to the dormitory in which she resided which created a reasonable doubt of the defendant's guilt. In *Szybeko*, as in the case at bar, the defendant and victim were acquaintances and the defendant denied commission of the sex act offense.

The victim in *People v. Coulson* (1958), 13 Ill. 2d 290, 149 N.E.2d 96, testified that the defendants, while armed with a pistol, robbed him of his money and thereafter drove him home for more money. In reversing the armed robbery conviction on this incredible evidence, our supreme court held:

> "This resume of the testimony shows that the evidence relating to the material facts in issue was conflicting and cannot be reconciled. Under such circumstances it is the duty of a jury, or of a court sitting without a jury, to determine the credibility of the witnesses and the weight to be given their testimony, and on review, this court will not substitute its judgment for that of the jury or trial court. [Citations.] *But it is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed. [Citations.] A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt.* If a conviction is to be sustained, it must rest on the strength of the People's case and not on the

weakness of the defendant's case. [Citations.] The foregoing principle of law is corollary of the presumption of innocence to which a defendant in a criminal case is entitled, and to the rule that the People have the burden of establishing the defendant's guilt beyond a reasonable doubt." (Emphasis added.) *People v. Coulson* (1958), 13 Ill. 2d 290, 295-96.

The State's evidence in the case at bar is improbable and unsatisfactory. Further, the State's evidence totally lacks corroboration, where corrobative evidence would ordinarily exist and would be presented. The defendant denied commission of the criminal act attributed to him by the alleged victim. For these foregoing reasons, I submit, the defendant's conviction and sentence should be reversed.

I dissent further from this court's assessment of cost against the defendant "for the State's defending this appeal" under *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194. No guidelines or notices thereof have been established by our supreme court or this court for the assessment of such cost against a defendant, and to perniciously allow or deny cost without such guidelines is arbitrary and impermissible in my judgment.