(No. 56560.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. HENRY BRISBON, Appellant.

*Opinion filed April 19, 1985.—Rehearing denied May 31, 1985.*

348

Shelley A. Bannister, of Bannister & Byrne, and Joshua Sachs, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Edward Petka, State's Attorney, of Joliet (Mark L. Rotert, Jack Donatelli and Michael V. Accettura, Assistant Attorneys General, of Springfield, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Stateville prison inmate Henry Brisbon, was found guilty of the murder of another inmate, Richard Morgan, following a jury trial in the circuit court of Will County. After a hearing on the question of the imposition of the death penalty (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d)), the jury found that there were no mitigating factors sufficient to preclude a sentence of death. On February 24, 1982, the trial court entered judgment on the verdict. The sentence was automatically stayed (87 Ill. 2d R. 609(a)) pending direct appeal to this court under Rule 603 (87 Ill. 2d R. 603).

On October 19, 1978, prison guard Nobie Mercer was accompanying a new prisoner to his cell on level 8 of the B—East segregation unit at Stateville Penitentiary. As they passed cell 831, the defendant, Henry Brisbon, asked to be let out of his cell to go to the washroom because his toilet was clogged. Mercer refused at that time and proceeded to lock up the new prisoner. The third time he passed the defendant's cell, Mercer opened it. When he did, the defendant seized Mercer and held a

homemade knife to his throat. The defendant ordered Mercer to release Herman Morgan from a neighboring cell, and he complied. The defendant then locked Mercer in Herman Morgan's cell.

Inmates Tyreed Green, Josie Baynes, and Luke Ward were eyewitnesses to all or portions of the following events which occurred during Mercer's six-minute confinement. The defendant and Herman Morgan went up to level 10 (one floor above level 8), looked around as if searching for someone, and then walked down the back stairs to level 2. The victim, inmate Richard "Hippie" Morgan, was standing in front of a cell on level 2, conversing with another inmate. The defendant and Herman Morgan, now joined by another inmate, Donald Binford, approached Richard Morgan. Binford and Herman Morgan seized Richard Morgan and Brisbon stabbed him from behind in the upper back. The victim struggled to break free and was stabbed again by the defendant in the lower back. He finally broke free, ran erratically, and fell. The three men chased the victim, and upon overtaking him, one of them kicked him. At this point the three men ran upstairs. The victim managed to get up again and run to a prison guard. He collapsed again and was taken to the prison hospital. He died shortly thereafter.

As the defendant, Binford and Herman Morgan fled upstairs, they passed one of the witnesses, Josie Baynes. The defendant said to Baynes: "I tried to kill that [obscenity]." The defendant then released Mercer from the cell, and Mercer locked Herman Morgan and Brisbon into their respective cells. Mercer finished taking a prisoner count and then reported the event to the deputy warden.

Witness Tyreed Green testified that five days before the stabbing, he observed Binford take a spoon from a serving cart after they had served a meal to the prisoners. Later that same day, Green observed the defend-

ant sharpening a spoon on the concrete floor while Binford stood in front of his cell.

A homemade knife was recovered from underneath the level 2 stairway. It was 6-7 inches in length with a cardboard handle taped to the blade. Bloodstains on the knife matched the victim's blood type. Two fingerprints were lifted from the knife that were found underneath its cardboard handle. These prints matched those of the defendant. The knife's paper sheath was made from a page of a shoe catalog. The defendant had been seen earlier with such a catalog.

An autopsy of the victim revealed five stab wounds, two of which were fatal. The two fatal wounds were to the upper back; they punctured the lungs and severed the pulmonary artery, causing major internal bleeding. According to the pathologist's testimony, the victim could have remained lucid for 10 to 15 minutes. He further testified that the two fatal wounds and all but one of the other punctures were made by a sharp instrument, 6-7 inches in length. He stated that the wounds indeed could have been made by the homemade knife in question.

The jury found Henry Brisbon guilty of murder, and in a separate hearing sentenced him to death. In the first phase of the bifurcated sentencing hearing in which a defendant's eligibility for the death penalty is determined, the parties stipulated that the defendant was born on January 12, 1956, and that the victim was killed while incarcerated in Stateville penitentiary. In addition, the State presented evidence that the defendant had been found guilty of two previous murders, along Interstate 57, known commonly as the "I-57" murders. The jury found the defendant to be over 18 years of age, and found two statutory aggravating factors to be present:

"the murdered individual was an employee of an institution or facility of the Department of Corrections, or

any similar local correctional agency, killed in the course of performing his official duties, or the murdered individual was an inmate at such institution or facility and was killed on the grounds thereof, or the murdered individual was otherwise present in such institution or facility with the knowledge and approval of the chief administrative officer thereof" and

"the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts." (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(b)(2), (b)(3)).

The jury thus found the defendant eligible for the imposition of the death penalty.

In the second phase of the sentencing hearing, the parties presented evidence in aggravation and mitigation. The State presented evidence of the defendant's convictions, which included two murders, a rape and armed robbery, two other armed robberies and an aggravated battery. In addition, the State presented evidence that the defendant committed two other murders for which the defendant was never brought to trial. The first involved a complaint, dismissed for lack of probable cause, for a shotgun murder of a storekeeper. The storekeeper, however, had made a statement on his deathbed that the defendant had shot him. The second was another I-57 murder that the State did not prosecute, but that the defendant had admitted to others he committed. Finally, the State introduced evidence of the defendant's long disciplinary record within the Illinois prison system.

In mitigation, the defense presented evidence that the defendant's father, a Black Muslim, taught Brisbon that white people were "the devil." His father never disci-

plined him for his misbehavior and in fact believed his son was innocent of all wrongdoing. Father James Bresnahan, a Jesuit priest and professor of ethics, testified that, given the defendant's background, he saw serious ethical problems with subjecting Brisbon to the death penalty. He said that in his opinion, the death penalty has no deterrence value and may have the opposite effect on black criminals such as the defendant by furthering the State's oppressive and violent image. Dr. John Flanagan, a professor of criminal justice and a former consultant to the Illinois Department of Corrections, testified that long-term inmates "settle down" after a period of time. Reaching that point, however, is an uphill battle for the inmates because understaffing and inefficiency contribute to the violent and dangerous atmosphere of the prison.

The jury returned a verdict finding that there were "no mitigating factors sufficient to preclude the imposition of the death sentence."

The defendant first contends that the State's use of preemptory challenges violated his sixth amendment right to an impartial jury drawn from a fair cross-section of the community. (U.S. Const., amend. VI; *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692.) The basis for the argument is that there was a systematic exclusion of black women from the jury. The record is not entirely clear, but it appears that seven or eight black women were excluded peremptorily by the State, and that one black woman was excused by the court because of religious objections to the death penalty. Seven white women were peremptorily challenged, and six men were excused by peremptory challenge. The defendant does not specify the racial makeup of the excused men. The jurors selected were all men, and two men and one woman sat as alternative jurors. The defendant does not state the racial background of the ju-

rors but in his brief says: "The jury as sworn did not have any black *women* on it." (Emphasis added.) We cannot say from this record that the trial court erred in rejecting the contention that there was a systematic exclusion of black women.

The defendant next argues that he was denied a fair and impartial trial because the trial court abused discretion in denying a pretrial motion to sequester the jury. In addition, the defendant maintains that the trial court inadequately admonished the jury on the subject of contact with the news media during the trial, thereby causing reversible error.

Before the trial commenced, there was a television newscast that gave information concerning the defendant's I-57 murder convictions and long prison sentence. In response to a motion by the defendant, the judge presented the following question to the jury panel:

"Have you heard, read, or seen anything regarding this case, or either of the Defendants between the date that you were interviewed by the Court and this date?"

All jurors responded to the question in the negative. The defendant then moved to have the jury sequestered, and the trial court denied the motion.

It is within a trial court's discretion to deny a motion to sequester the jury. (*People v. Yonder* (1969), 44 Ill. 2d 376, 387.) A failure to sequester is not reversible error "[i]f there are adequate warnings given by the trial court and no demonstration of actual prejudice by the defendants." (44 Ill. 2d 376, 387.) In the present case, the trial court began the proceedings with the following admonishment:

"One of the things I would like to—I would like to stress most strongly with you and in the strongest possible terms is that you not read or discuss anything about the case, or watch any of the news shows, you know, if you have a good novel or something you can curl up with

at night, that would beat the ten o'clock news.

I would ask you, not to read or listen to anything about this case that would cause you grave problems and I would ask you to please not do that."

The trial court admonished the jurors in a similar manner repeatedly throughout the trial. During the trial, the defendant made no claim or showing that the jurors received prejudicial information. We hold that adequate warnings were given to the jury and that no showing of actual prejudice was made.

The defendant next contends that three prospective jurors were excluded in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. *Witherspoon* prohibits the exclusion for cause of prospective jurors who express only general objections to the death penalty. The standard created often has been described as permitting the dismissal only of jurors who make it "unmistakably clear" that they would "automatically" vote against the death penalty, language taken from a footnote in *Witherspoon*. (391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.) In the most recent articulation of the *Witherspoon* standard, however, the Supreme Court abandoned that language in favor of the statement, previously made in *Adams v. Texas* (1980), 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521, that a juror may not be excused unless his or her views " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. ___, ___, 83 L. Ed. 2d 841, 850-51, 105 S. Ct. 844, 852.) The *Wainwright* decision seems to be an acknowledgment of the practical difficulty for jurors prior to the hearing of evidence to answer in mechanical fashion whether it is "unmistakably clear" that they will "automatically" vote against the death penalty. This court in *People v. Gaines* (1981), 88

Ill. 2d 342, 356, perceived this problem:

"We think it is appropriate to point out that the distinction drawn in *Witherspoon* between a venireman's general opposition to the death penalty and his unwillingness to vote for its imposition is a sophisticated one which a prospective juror may not readily grasp. While it is the duty of the trial judge to propound the key questions in a form which will be understood and with enough specificity to admit of an unambiguous response, we do not read *Witherspoon* as prescribing a set catechism, or as requiring a venireman to express himself with meticulous preciseness."

We would first observe that the defendant did not object to two of the three exclusions of jurors. Generally, of course, a failure to object constitutes waiver of the right to raise the issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) A failure to object to the dismissal of a juror may have been a deliberate decision on defense counsel's part that for some other reason he did not want the person as a juror. See *Wainwright v. Witt* (1985), 469 U.S. ___, ___, 83 L. Ed. 2d 841, 859, 105 S. Ct. 844, 858 (Stevens, J., concurring).

Here, even if proper objection had been made, the record shows a proper basis for the exclusion of all three jurors under *Witherspoon*. The examination of Shelton Glenn, whose dismissal was not objected to, included the following:

"THE COURT: If you sat on a jury during the penalty phase of a hearing, would your response be to automatically vote against the death penalty no matter what the facts were in the case?

A. Yes.

* * *

DEFENSE COUNSEL: *** Are your feelings about the death penalty so deep-seated that *** you could not [impose the sentence of death] under any circumstances?

A. I don't feel like I could do it under any circumstances, if that is the question. I don't think I could go as

to approve the death penalty."

Glenn was properly excused for cause.

The examination of John McCain, whose dismissal was objected to, included:

> "THE COURT: Are your views against the death penalty so strong that you could not vote for the imposition of the death penalty no matter what the facts in the case were?
>
> A. Yes.
>
> * * *
>
> Q. *** Is there any kind of case like [Gacy] that you can possibly think of where you could see yourself in a position to consider the possible imposition of the death penalty?
>
> A. None whatsoever.
>
> * * *
>
> Q. In other words, if you were seated on this jury would it be your position that you would have to automatically vote against the death penalty no matter what the evidence was?
>
> A. Yes."

The defense counsel then posed a rather long, involved question to McCain. Asked by counsel whether, in a hypothetical debate on the subject, he was completely unable to listen to arguments in favor of the death penalty, McCain responded that he was "open to suggestions." The court, however, posed a final question to clarify McCain's viewpoint:

> "THE COURT: *** is there any circumstance at all where you could see yourself [imposing the sentence of death]?
>
> A. Not at this time, no."

McCain, too, was properly excused. The responses of a venireman must be viewed "not in isolation but as a whole." *People v. Gaines* (1981), 88 Ill. 2d 342, 357.

There was no objection to the dismissal for cause of Charlotte Stobert. Her examination included:

"THE COURT: *** are your views opposing the death penalty so strong that you could not consider it no matter what the circumstances were in the case?

A. I think so.

* * *

Q. In other words, is it a correct statement of your views, that you feel that the death penalty should not be imposed in any kind of case?

A. Yes.

* * *

DEFENSE COUNSEL: *** could you then, sit if you were chosen as a juror *** and see if the death penalty was worthy?

A. No.

Q. *** Can you conceive of any case in your own mind where you could follow the law and find that the death penalty should be imposed?

Could you consider imposing the death penalty under a fact situation in your mind that would justify it, or would you be saying in no case ever could I ever follow the law?

A. I think that's probably it. I guess *I couldn't follow the law*.

I didn't realize that's what the question meant. I'm sorry." (Emphasis added.)

Mrs. Stobert in her own words could not "follow the law." She was properly excused for cause.

The defendant contends that it was reversible error for the trial court to deny the defendant's motion to excuse Edward Tkac for cause from the jury venire. The defendant argues that Tkac represented that he would automatically impose the death penalty for all premeditated murders, and that therefore he was biased in favor of the death penalty in violation of *Witherspoon*. As we have held previously, there is no "reverse-*Witherspoon*" rule that requires the trial court to "life qualify" a jury to exclude all jurors who believe that the death penalty should be imposed in every murder case. (See *People v.*

*Caballero* (1984), 102 Ill. 2d 23, 45-46; *People v. Ramirez* (1983), 98 Ill. 2d 439, 459-60.) A defendant, however, is free to question the jurors regarding bias, and it is then for the trial court to decide whether to excuse a juror for cause. *People v. Hyche* (1979), 77 Ill. 2d 229, 239.

The denial of such a dismissal for cause does not constitute trial error unless a defendant shows that a "juror on his jury believed that the death penalty should be imposed in every case where a defendant is convicted of murder." (*People v. Caballero* (1984), 102 Ill. 2d 23, 45.) Tkac's statement was not that the death penalty should be imposed in "every case where a defendant is convicted of murder," and Tkac assured the judge that he would "follow the law." In any event, Tkac did not serve on the jury that convicted the defendant or sentenced him to death. He was peremptorily excused by the defendant.

The defendant next contends that he was not found guilty beyond a reasonable doubt. He says that the prosecution witnesses lacked credibility and that their testimony contained inconsistencies which caused the State's case to "tumble to the ground." When presented with a challenge to the sufficiency of the evidence, a court of review will not set aside a criminal conviction unless the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227.) It is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn therefrom. (*People v. Akis* (1976), 63 Ill. 2d 296; *People v. Zuniga* (1973), 53 Ill. 2d 550.) Further, minor inconsistencies in the testimonies do not, of themselves, create a reasonable doubt. (*People v. Thiel* (1981), 102 Ill. App. 3d 28, 31; *People v. Gonzales* (1978), 60 Ill. App. 3d 980, 990.) The defendant characterizes Mercer's description of how

the defendant was released from his cell as "incredible." He notes that Josie Baynes, one of the eyewitnesses to the stabbing, testified that he did not see the defendant hold a knife to Mercer's throat to obtain his release from the cell. Mercer, of course, was not a witness to the stabbing. Regardless of how the defendant was released from his cell, all the witnesses agree that the defendant indeed was released from his cell. Whether Mercer's testimony was credible was a matter for the jury to decide.

Josie Baynes and Luke Ward were eyewitnesses to the stabbing. Tyreed Green viewed the victim shortly after he was stabbed. The defendant attacks the witnesses' credibility on several fronts, including the inmates' prior records, gang affiliations, their refusal at first to admit to having witnessed the crime, and their request to be transferred to another facility which later was granted. It is understandable that an inmate may at first be reluctant to testify against a fellow inmate. And if an inmate does decide to testify, it is not unreasonable for him not to wish to remain in the same prison. The jury was given this possibly discrediting information regarding the prosecution witnesses. It was the jury's function to draw conclusions based on the evidence and decide whether there was a reasonable doubt as to the defendant's guilt. The inmates' testimony, of course, was not the only evidence for the prosecution. Significant physical evidence corroborated the witnesses' testimony. The blood on the knife matched the victim's and fingerprints on the knife matched the defendant's. We find no reason to disturb the jury's conclusion that the defendant was guilty beyond reasonable doubt.

The defendant maintains that the trial court improperly restricted the cross-examination of Tyreed Green. On cross-examination, the defense examined Green as to his numerous convictions. In regard to an attempted-murder conviction in 1969, the defense proceeded to

elicit details of that offense, at which point the prosecution objected. After long deliberation, the trial court sustained the objection. The defendant argues that the fact that the attempted murder involved a police officer was crucial to the defendant's impeachment of Green.

It is within the trial court's discretion whether or not to permit cross-examination concerning the circumstances of a witness' prior conviction. (*People v. Humes* (1979), 78 Ill. App. 3d 255, 259-60; *People v. Upshire* (1978), 62 Ill. App. 3d 248, 252; *People v. Harland* (1976), 41 Ill. App. 3d 355, 357-58.) This court will overturn a ruling on the scope of cross-examination "only where an abuse of that discretion results in manifest prejudice to the defendant." (*People v. Owens* (1984), 102 Ill. 2d 88, 103; see also *People v. Kline* (1982), 92 Ill. 2d 490, 503-05.) Here, the jury was informed of Green's multiple felony convictions, that he was denied parole three times, and that he was transferred out of Stateville after cooperating with the State. Too, the jury could observe Green's demeanor while testifying. The jury thus was in a position to determine the witness' credibility. The trial court's ruling was not an abuse of discretion, and it did not impede the jury in assessing the credibility of Green's testimony.

The defendant asks us to overrule this court's decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535, 539, which rejected claims that our death penalty statute confers unconstitutionally broad discretion to the prosecution in determining whether to seek the death penalty. The defendant offers no new or compelling reason for so overruling *Cousins* and we decline to do so, as we have declined in *People v. Caballero* (1984), 102 Ill. 2d 23, 49, *People v. Silagy* (1984), 101 Ill. 2d 147, 161, and *People v. Szabo* (1982), 94 Ill. 2d 327, 351. The defendant also asks us to hold that the death penalty statute is unconstitutional because it fails to require

pretrial notice of the prosecution's intention to seek the death penalty. This contention was considered and rejected in *People v. Gaines* (1981), 88 Ill. 2d 342, 369, and *People v. Caballero* (1984), 102 Ill. 2d 23, 49.

The defendant claims that the second phase of his sentencing hearing, relating to aggravation and mitigation, contained errors that require a vacation of the death sentence. He first says that the trial court admitted evidence concerning his involvement in the I-57 murders in violation of his right of access to the courts. The defendant had originally confessed the I-57 murders to a prison law librarian assigned by the State to assist inmates with post-conviction remedies. In 1975, the defendant was incarcerated at Stateville and sought assistance from Robert Lee, an inmate who served as the prison law librarian. After Lee had prepared a document for the defendant in some unrelated matter, the defendant volunteered that he had committed the I-57 killings. This led to his indictment and conviction for those murders. In *Johnson v. Avery* (1969), 393 U.S. 483, 21 L. Ed. 2d 718, 89 S. Ct. 747, the court held that the State is under an obligation to provide prisoners with meaningful access to the courts for post-conviction remedies. The defendant argues that his rights under *Johnson* were violated because the State used information obtained from Lee. The defendant does not claim that an actual attorney-client privilege existed. He maintains that the use of such evidence has a chilling effect on the exercise of his sixth amendment right of access to the courts.

The argument has been adjudicated; it was considered and rejected by the appellate court on the defendant's I-57 murder appeal. (*People v. Brisbon* (1980), 89 Ill. App. 3d 513, 523.) As the appellate court correctly reasoned, *Johnson* confers a right of access to the courts for post-conviction relief, but conferring the right to

post-conviction assistance certainly cannot be said to create a general privilege that would protect and insulate evidence concerning matters other than post-conviction assistance. The appellate court observed that boasting to a prison librarian about having committed unprosecuted crimes does not concern having access to the courts for post-conviction relief.

Another contention of the defendant is that the trial court abused discretion in admitting in aggravation evidence of his involvement in the killing of Perry Green, where a charge against him was dismissed for want of probable cause. Over the defendant's objection, a detective, Thomas Ptak, testified to his investigation of the murder of Perry Green. Green was shot in the face with a shotgun. At the hospital, he was told that he was going to die. At their first meeting, Green told Detective Ptak that his assailant was a young black man that he knew as the boyfriend of a girl he recently had fired. At their second meeting, Green identified Janice Williams as the employee he had fired and at that time he remembered the name of her boyfriend who had shot him. The name was Brisbon. Williams then was questioned by Ptak, and she confirmed Green's statement regarding her dismissal. Further she told Ptak that the defendant had told her that he had shot Green. The defendant turned himself over to police and was charged with murder. At a hearing on probable cause, the two eyewitnesses to the shooting and Janice Williams refused to testify, and the charge against the defendant was dismissed for want of probable cause. The jury here was informed of the above facts.

The only limitations upon evidence to be admitted at the aggravation and mitigation phases of the sentencing hearing are relevance and reliability; the hearing is not confined by rules of evidence in effect at the guilt phase of the trial. (*People v. Free* (1983), 94 Ill. 2d 378, 426-27;

*People v. La Pointe* (1981), 88 Ill. 2d 482, 495-99; Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).) Testimony of misconduct may be admitted though the misconduct may not have resulted in prosecution and conviction. Thus, the question is one of whether the trial court abused discretion by ruling that the evidence concerning Mr. Green was relevant and reliable. The defendant does not attack directly the relevancy or reliability of the evidence. He argues that it should not be admitted because it was hearsay and because the charge against the defendant was dismissed for want of probable cause. As we have said, that the testimony complained of was hearsay was not pertinent to its admission.

The evidence taken from Green by Detective Ptak was obtained when Green knew he was dying. Although this evidence may indeed fall under the dying-declaration exception to the hearsay rule, it is unnecessary to decide that question. Considering the circumstances we regard that the testimony of Ptak, including the statements of Green to which he testified, was reliable. The evidence was relevant, too, because it related to past conduct of the defendant. The jury was made aware that the charge was dismissed for lack of probable cause and was able to consider this in weighing the aggravation value of the evidence.

The defendant contends that the reliability of the evidence could not be tested because there were no witnesses to be cross-examined. That, however, was not a barrier to the reception of evidence. As this court in *People v. Jones* (1982), 94 Ill. 2d 275, 286-87, observed, "a defendant in a capital case has no due process right to cross-examine all out-of-court sources of information relied upon for sentencing." The trial court did not abuse discretion in admitting the evidence of the defendant's involvement in the death of Green.

The defendant also argues that the prosecutor, in

closing argument at the death penalty hearing, made comments that were improper and prejudicial. He first contends that it was reversible error for the prosecutor to comment on the possibility of the defendant obtaining parole. While summarizing the defendant's prior record, the prosecutor stated to the jury:

"The [I-57] trial was held in the Circuit Court of Cook County. The Defendants who testified, Charleston and Thompson, I believe received 16 years. Mr. Sanders was tried and convicted. He received 300 to 900 years. Mr. Brisbon received 1,000 to 3,000 years. Not since the days of Methuselah in the Old Testament have we had anyone approach one thousand years.

In all facts and circumstances, a life sentence. However, as Father Bresnahan pointed out, *the Defendant, even though he had a prison sentence of 2,000 to 3,000 years was eligible for parole. Eligible. Not saying he was going to get it. Eleven years and a few months.*

At this point in time, the Defendant could have faced the realities of the prison. He had been sentenced on other charges. He was sentenced on the aggravated battery, for the car theft out of Kankakee County, but instead, we have repeated violations, repeated incidents, repeated reports of aggression, finding of weapons, aggressive acts toward guards, inmates, administration, wardens." (Emphasis added.)

In *People v. Szabo* (1983), 94 Ill. 2d 327, 365, this court held this statement by the prosecutor amounted to reversible error:

"I'm a little bit surprised counsel would point out the period of incarceration that we are talking about. Of course, he does for 'X' number of years, according to the present law, say a person got 30 years in prison or 40 years in prison . . . It assumes one thing which you and I have very little control over. Members of the jury, in the last seven years in this state, parole eligibility has changed three times. Three times. We have gone from sentencing that existed prior to the Unified Code of Corrections where a man could be paroled in eleven years.

We then . . . basically reduced it slightly and modified it and we went back to the flat time sentences. Assuming that the law does not change, the premise may be correct . . . do you really want to have the decision made whether or not John Szabo should have the opportunity to walk in society, made by some bureaucrat with very little standards, sometime down the road, where you don't even know what the law is going to be at the time? *** Members of the jury, in my opinion, justice doesn't mean a person who has been convicted of two murders should be sent to prison, cooling his heels, until some bureaucrat decides to release him."

The remarks here, while less explicit, contained the same objectionable matter as the statement in *Szabo*. The jury learned that though the defendant had been sentenced to 1,000 to 3,000 years for the I-57 killings, he would be eligible for parole in 11 years and a few months. This information could have angered the jury to the point of influencing their proper consideration of the imposition of a sentence of death. The possibility of parole is immaterial to the aggravating and mitigating issues of a capital-sentencing hearing. " '[T]he fact that he may eventually be paroled by the executive branch of our State government does not mean that he should be executed to prevent that possibility. By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur.' " *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67, quoting *People v. Walker* (1982), 91 Ill. 2d 502, 515.

The State argues that the comment was based on information brought out in the direct examination of one of the defendant's own witnesses, and was in response to defense counsel's arguments that the defendant would never be released from prison. In light of *Szabo*, however, we consider that the comment on parole was a

highly prejudicial overreaction by the prosecutor.

We are aware that in *California v. Ramos* (1983), 463 U.S. 992, 77 L. Ed. 2d 1171, 103 S. Ct. 3446, the Supreme Court held that an instruction required by State law that a sentence of life imprisonment without possibility of parole may be commuted to a sentence that includes a possibility of parole was not violative of the Constitution of the United States. The court, in a footnote (463 U.S. 992, 1013 n.30, 77 L. Ed. 2d 1171, 1189 n.30, 103 S. Ct. 3446, 3459-60 n.30), observed that many State courts have held that instruction or argument on the possibility of parole is improper. The court cited our decision in *People v. Walker* (1982), 91 Ill. 2d 502, 515, as resting on interpretation of our capital-sentence statute. It quoted from *Walker:* " '*Our statute requires* that the court or jury, as the case may be, consider aggravating and mitigating factors, which are relevant to the imposition of the death penalty. . . . Whether or not the defendant may, at some future time, be paroled is not a proper aggravating factor to consider in determining whether the death penalty should be imposed.' [Emphasis added by United States Supreme Court.]" 463 U.S. 992, 1014 n.30, 77 L. Ed. 2d 1171, 1189 n.30, 103 S. Ct. 3446, 3459 n.30.

The defendant next argues that it was reversible error for the prosecutor to argue, through the citing of homicide statistics, that the discontinuing of capital punishment in our country caused a sharp increase in the number of homicides. In closing argument, the prosecutor said:

> "Something I would like to share with you about the government in its policeman role, protecting under Constitutional mandates the rights of each and every citizen to be secure, with the blessings of liberty, to be secure in their homes, on the street, wherever it may be, and those facts don't argue towards deterrence or non-deterrence.

They may be only a historical interest.

In 1955, 76 people were executed, yet there were 7,000 homicides in this country.

In 1975, 20 years later, because of the Supreme Court decision, the State—the various states gave up their policeman function. We had 20,000 plus homicides.

Mr. Bolden refers quite eloquently to the proposition that we do not have a right to take a life.

The sanctity of human life is paramount.

Every morning when my four children come to my bed, I can't quarrel with that proposition they are my most precious possessions. Just, as I am sure, Betty Lou was a precious possession. Just as Dorothy Cerney was a very precious possession of her parents. Mr. Schmidt was a very precious possession of someone he loved."

In *People v. Szabo* (1983), 94 Ill. 2d 327, 363, also, the prosecutor referred to the same statistics in an argument which this court held to be prejudicial error:

"I was reading a book a while back by Frank Carrington, who is the executive director for Americans for Effective Law Enforcement.

In 1955, there were 76 executions in this nation. We had 7,000 homicides. In 1975, there were no executions in this nation. We had 20,000 homicides.

Is it any wonder that today the average citizen feels that capital punishment is necessary in order that criminals be adequately punished to insure that they do not kill some else . . . A few more statistics. Mr. Carrington pointed out in 1974, as a statistical fact, that a child born in 1974 has a statistically greater chance of being murdered on the streets of America than the chance of a combat soldier being killed in the second World War."

The essence of the remarks in both cases was identical: that the death penalty is necessary to halt the dramatic rise of homicides in this country. The remarks could have served only to arouse the fears and prejudices of the jury. They have "no more place in the sentencing determination than [does] the 'speculative possibility' of pa-

role." (94 Ill. 2d 327, 364.) The defendant, had a right to be judged on his conduct alone, without the introduction of inflammatory considerations. The danger that the jury's imposition of the death penalty may have been improperly influenced by the comment was a real one.

The defendant contends, too, that photographs of the I-57 victims were improperly introduced into evidence at the first phase of the sentencing hearing. He argues that *People v. Davis* (1983), 97 Ill. 2d 1, held such photographs of defendant's murder victims to be prejudicial in a section 9—1(b) hearing. The first phase of the sentencing hearing is to determine the defendant's eligibility for the death penalty. The State must prove beyond reasonable doubt that the defendant is over 18 years of age, and that at least one statutory aggravating factor exists. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b).

At the opening of the section 9—1(b) hearing, the defendant agreed to the following stipulations:

> "It is hereby stipulated by and between the parties that on October 19th, 1978, Richard E. Morgan was an inmate at Stateville Correctional Center, legally sentenced thereto, and that he was on the premises of that institution when he was killed.
>
> It is hereby stipulated by and between the parties that the Defendant, Henry Brisbon, was born in the City of Chicago, on January 12th, 1956."

The State then went on to offer proof of a second aggravating factor under which the defendant must have been convicted of murdering two or more individuals. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).) The State introduced testimony of the defendant's two convictions for the I-57 murders. At the completion of this testimony, the State moved to introduce three photographs of the murder victims. The purpose of this evidence, the State argued, was to prove the requirement of section 9—1(b)(3) that "the deaths were the result of either an in-

tent to kill more than one person or of separate premeditated acts." (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3).) The trial court allowed the photographs into evidence.

The photographs were not necessary for the State to establish the section 9—1(b)(3) factor because, as the defendant points out, it is not necessary to show that the defendant was convicted of two separate murders prior to the one in the trial just concluded. The prosecution need only show that the defendant was convicted of a total of two murders prior to the sentencing hearing, and that the murders were separate acts. It is obvious that the I-57 murders and the prison murder were separate acts. The State did not need to show that the two I-57 murders themselves were separate acts. Thus, the photographs were not relevant to any issue of the first phase of the sentencing hearing.

The purpose of the first phase of the capital sentencing hearing is to allow the jury to determine the defendant's eligibility for the death penalty free from any potentially inflammatory evidence that could improperly influence this decision. Only evidence having a direct bearing on the statutory prerequisites should be admitted. Here, the first two photographs, in color, were of each victim lying face down on the ground with large blood stains on their backs. There was a small pool of blood on the ground next to the female victim. The third photograph, in black and white, was taken from a longer distance and showed both victims. The introduction of the photographs was unnecessary and prejudicial.

The State argues that the admission of the photographs was harmless error because the defense had stipulated to facts that would satisfy the eligibility requirements. It argues that there was no need to prove the second aggravating factor of "two or more murder convictions," because the defense stipulated to the fact that the victim, Morgan, was an inmate who was killed on the premises of an institu-

tion, which is a separate aggravating factor that would have established the defendant's eligibility. This reasoning was rejected in *People v. Davis* (1983), 97 Ill. 2d 1, 25-29. In *Davis*, there was evidence presented at the first phase of the sentencing hearing—copies of four murder convictions—that established the aggravating factor of two or more murder convictions. Other evidence was admitted that was irrelevant and prejudicial, and because of this the sentence was vacated. The admission of similarly prejudicial photographs in *Davis* was one of the factors that caused the vacation of the sentence of death. Considering the prejudicing comments on parole and on statistics regarding the death penalty and considering the introduction of the photographs, the sentence of death must be vacated.

For the reasons given, the defendant's conviction of murder is affirmed and the sentence is vacated. The cause is remanded to the circuit court of Will County for a new sentencing hearing.

*Judgment affirmed; sentence*
*vacated; cause remanded.*

JUSTICE SIMON, concurring:

I concur in the court's judgment that the sentence in this case should be vacated and the cause remanded to the circuit court for a new sentencing hearing. While I agree with the reasons offered by the majority for reversing the death penalty in this case, I disagree with its comments regarding *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531 (106 Ill. 2d at 362). For the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that *Cousins* should be overruled.