THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WARREN THOMAS, Defendant-Appellant.

First District (1st Division) No. 1—88—0770

Opinion filed May 13, 1991.—Rehearing denied July 16, 1991.

752

Barbara Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Walter P. Hehner, and Kevin Hughes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Warren Thomas was charged with aggravated criminal sexual assault, kidnapping, criminal sexual assault, aggravated kidnapping, armed robbery and aggravated unlawful restraint, and he was tried with his co-defendants Eric Thomas and Edward Bond. After the jury trial, Thomas was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)) and criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)) and sentenced to 10 years for aggravated criminal sexual assault. He appeals both the convictions and the sentence.

During the State's case in chief, the complainant testified: On December 8, 1986, at approximately 2 a.m., she was walking outside when a man grabbed her. The man was later identified as Eric Thomas. She struggled with Eric Thomas. Then, a maroon car drove by and she was forced into the maroon car's back seat. Eric Thomas also sat in the back seat. A driver and another passenger sat in the front seat. The front seat passenger was later identified as Edward Bond. Edward Bond hit her in the eye, and then she was blindfolded. She saw Edward Bond because he hit her in the eye and she saw the man who grabbed her from the street. The car was traveling for about twenty minutes.

When the car stopped at an apartment building, the blindfold was removed but she was told to keep her eyes shut. The complainant was taken to a second-floor apartment. As she approached the apartment, she heard voices in the apartment. Once inside the apartment, she was ordered to take off her clothes. She thought there were at least five men in the apartment. In the apartment, she was blindfolded and her wrists were tied. Additionally, a rope was tied around her neck and ankles and she was tied to a bed. She was forced to have oral, vaginal and anal sex numerous times with different men.

After about an hour and a half of forced sexual acts, all of the men left except Edward Bond. Edward Bond then untied her, took off the blindfold and told her to put on a top because he wanted to take her next door. He then told the complainant that he "would blow her head off" if she did not do as he said. Edward Bond grabbed his gun, loaded it and pointed the barrel at her head. He walked her across the hallway, knocked on an apartment door and a man answered. The

man who answered the door was later identified as the defendant. Edward Bond told the defendant "look what I brought you."

After the complainant was forced into the defendant's apartment, Edward Bond forced the complainant to engage in oral sex with the defendant while the defendant was sitting on his couch. During oral sex, the defendant ejaculated and the complainant spit it out onto the floor. Then, the complainant was forced to engage in vaginal sex with the defendant. Edward Bond was sitting on a chair watching and later forced the complainant to have oral sex with him. Edward Bond, again, threatened to "blow her head off."

While in the defendant's apartment, Edward Bond forced the complainant to phone her mother and tell her that she would not be home for a couple of days. When the complainant called home, her brother answered. Then, Edward Bond told the complainant that he wanted her to pose for the defendant and Eric Bond.

Subsequently, Edward Bond took the complainant back to his apartment, forced her to engage in anal sex again and tied her to the bed by her neck, wrists and ankles. After a few hours passed, Edward Bond told the complainant that he was going to the store to buy her a red bikini so he could take some pictures of her.

After Edward Bond left the apartment, the complainant tried to untie herself. When the complainant successfully untied herself, she grabbed her jeans and her jacket and ran out of the apartment naked. She flagged down a school bus. There were a man and woman aboard the bus. The woman was later identified as Diane White. The complainant told the man and Diane White what happened and asked them to call the police.

She told the police what happened and described both apartments in detail. The complainant then took the police to the building she had escaped from and led them to the floor where the apartments were located. Then, the complainant left the apartment building and got into a police car. When she was in the car, she saw the defendant walking into the apartment building. Thereafter, the defendant was arrested.

On cross-examination, the complainant denied telling Diane White that she had sex with 10 or 12 people and the complainant did not recall telling Diane White that she never saw the people who raped her or that she was taken from one apartment downstairs to another apartment.

Chicago police officer James R. Lilly testified: On December 8, 1986, he was working with his partner, Officer Stephanie Kimbrough. At approximately 2:35 p.m., he received a call about a rape victim.

When he arrived at the scene, the complainant stated that she had been raped. The officer interviewed the complainant and then she took the officers to the apartment where she was held and identified the defendant's apartment as the second apartment. Later, when they all were in the police car, the complainant recognized the defendant as he walked into the apartment building.

Chicago police officer Walter Tamberlin's testimony was substantially similar to Officer Lilly's testimony. Officer Tamberlin testified that the complainant told the police that weapons were located in the first apartment's closet. Officer Tamberlin found three shotguns in the closet. He also found several photographs of men and women in various sex acts. The complainant was not in any of the pictures, but she identified the man in the photos as a co-defendant. While Officer Tamberlin attempted to set up surveillance of the building, the complainant, who was in a police car, identified the defendant. Subsequently, Officer Tamberlin arrested the defendant. Later that day, Officer Tamberlin entered defendant's apartment and its appearance resembled the complainant's description. Defendant's apartment had blue walls, a couch and a bed separated by a string of beads.

On cross-examination, Officer Tamberlin stated that he did not write down the complainant's description of the apartment. He took mental notes of the description and then wrote in his report that the apartment was as the complainant described. Officer Fortuna actually wrote the report, but Officer Tamberlin read it and signed it. The complainant told Officer Tamberlin that the defendant had oral and vaginal sex with her but never told him the defendant had anal sex with her. Officer Tamberlin did not recognize a supplemental police report, did not know if it was his signature on the report and stated that the report would be wrong if it related that the complainant was called back from being en route to the hospital to identify the defendant.

The defendant testified on his own behalf: On December 8, 1986, he finished work about 2:30 a.m., went to a bar until about 3 a.m. and arrived home around 3:30 a.m. He noticed Eric Bond standing alone outside the apartment building. The defendant went to his apartment and began cleaning it. Then, Eric Bond came to his door and asked for a cup of coffee. After the defendant gave Eric Bond some coffee, the defendant went to sleep. The defendant woke at approximately noon and went to pay his phone bill. When he returned, he saw police cars near his apartment building. Later, he was arrested because a woman said she had been raped in his apartment. The defendant denied having any sort of intercourse with the complainant in his apart-

ment. The defendant showed the jury his chest and indicated that he had a large incision scar from his chest to his groin area.

On cross-examination, the following colloquy was exchanged between the defendant and the assistant State's Attorney:

"Q. Did you use the name James Stanford to the police, ever use that name?

A. No.

Q. Larry Bonns?

A. No.

DEFENSE ATTORNEY: Judge, I am going to —

Q. Tommy Taylor?

DEFENSE ATTORNEY: Judge, I am going to object to this line of questioning unless there is some foundation shown to this, any relevance shown to this.

THE COURT: All right, objection sustained."

Additionally, Diane White testified that she saw the complainant running down the street. She called the police. The complainant told her that she had been raped by 10 or 11 people. The complainant also told her that she was taken downstairs and raped by someone else in another apartment.

It was stipulated that if Christine Brown testified, she would state that she is a criminalist and microanalyst working for the Chicago police department. She analyzed the smears and swabs taken from the complainant and determined that the swabs and smears were negative for spermatozoa and semen.

It was also stipulated that if Officer Fortuna testified he would say that he wrote a report on December 18, 1986, which stated that the complainant told him she was forced to have oral copulation and anal intercourse with the defendant. He wrote in the report that the reporting officer cleared the area of marked squad cars and set up surveillance of the apartment while the complainant was en route to the hospital. A short time later, the defendant approached the building and was stopped for questioning by the reporting officer. The reporting officer called the complainant back and the complainant identified the defendant.

During a jury instruction conference, defense counsel objected to the last line of the definition of sexual penetration which stated that evidence of emission of semen is not required to be proved.

The trial court instructed the jury to disregard answers to any questions where an objection was sustained.

The jury found the defendant guilty of both aggravated criminal sexual assault and criminal sexual assault. The trial court denied

defendant's motion for a new trial and sentenced the defendant to 10 years for aggravated criminal sexual assault. The defendant's conviction for criminal sexual assault was vacated because it merged with the aggravated criminal sexual assault.

We are not persuaded by defendant's argument that he was not proven guilty of aggravated criminal sexual assault beyond a reasonable doubt because the complainant's testimony was "not clear and convincing or sufficiently corroborated." When presented with a challenge to the sufficiency of the evidence, a court of review will not set aside a criminal conviction unless the evidence is so unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Byrd* (1990), 206 Ill. App. 3d 996, 1006, 565 N.E.2d 176, *appeal denied* (1991), 137 Ill. 2d 667; *People v. Westfield* (1990), 207 Ill. App. 3d 772, 777, 566 N.E.2d 392.) "It is the function of the jury to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn therefrom." (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.) A careful review of the record in the light most favorable to the prosecution convinces us that a rational fact finder could have found the defendant guilty beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453.) The complainant consistently described that a man in the second apartment forced her to have oral and vaginal sex. She identified the defendant at the scene of the crime and at trial as the man in the second apartment. Additionally, the complainant's testimony was corroborated by Officer Tamberlin's testimony that the description the complainant gave of the defendant's apartment matched the defendant's apartment and that he found a loaded gun and ropes in the first apartment.

Additionally, defendant argues that the complainant's testimony was inconsistent. He specifically refers to Diane White's testimony that the complainant said "she was raped by ten or eleven men, that she could not see any of the attackers' faces and that she was taken downstairs to the second apartment." We find that these contradictions or inconsistencies with respect to the complainant's testimony do not, of themselves, create a reasonable doubt. (See *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276.) "Mere discrepancies only affect the credibility of the witness. It is for the trier of fact to weigh any discrepancies, and, if minor, the victim's testimony may still be considered clear and convincing." (*People v. Harris* (1989), 187 Ill. App. 3d 832, 838-39, 543 N.E.2d 859.) We hold that

the jury was entitled to find the complainant's testimony clear and convincing, and that the minor discrepancies did not constitute reasonable doubt. Her testimony, when examined in its entirety, could reasonably have been found by the jury to clearly and convincingly establish aggravated criminal sexual assault.

■ Defendant also argues that he was prejudiced and deprived of a fair trial when the People elicited testimony regarding lewd photographs found in Edward Bond's apartment. However, the defendant has not preserved this argument for appeal because he did not allege this claimed error in his post-trial motion. His post-trial motion only alleges, *inter alia*, "[t]hat the court erroneously admitted into evidence *** photographs *of Eric Bond's apartment*," rather than the post-trial motion specifically alleging that Officer Tamberlin's testimony with respect to the photographs was prejudicial and deprived the defendant of a fair trial. Moreover, the defense attorney concedes that "this error was not completely preserved."

■ Furthermore, this case does not fall within the plain error exception because the evidence was not closely balanced after considering the complainant's testimony and because the claimed error "was not of such a magnitude" that the defendant was denied a fair trial. Testimony with respect to the "lewd" pictures came in during Officer Tamberlin's testimony. Officer Tamberlin described his investigation and stated that the complainant was able to initially identify the co-defendant, Edward Bond, from the pictures. The defendant was tried in the same case as co-defendant Edward Bond. The defendant was not prejudiced by these pictures. He was not in the pictures, the pictures were found in co-defendant Edward Bond's apartment, the jury did not see the pictures and the defendant testified that he had never seen the pictures and had never been asked about them.

As authority for his argument that testimony regarding the "lewd" photographs was prejudicial and denied him a fair trial, defendant cites *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528, *People v. Liapis* (1972), 3 Ill. App. 3d 864, 279 N.E.2d 368, and *People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401. In those cases, the court determined that the admission of evidence was reversible error when such evidence was not connected to the crime and, thus, was not relevant. The admission of testimony with respect to the "lewd" photographs was not reversible error because the testimony was relevant with respect to the officer's investigation and, as stated, did not prejudice the defendant.

■ Next, defendant argues that he was denied a fair trial when the assistant State's Attorney questioned him about his aliases in order to suggest that he was involved in prior criminal activity. Defendant has also failed to preserve this argument for appeal because he did not allege it in his post-trial motion. Even if this court were to review the merits of the defendant's argument, he was not denied a fair trial because the court sustained the defense attorney's objection and directed the jury to disregard the questions.

■ Additionally, the defendant argues that the trial court erred in giving Illinois Pattern Jury Instructions, Criminal, No. 11.65 (2d ed. Supp. 1987), contending that the statement "evidence of the emission of semen was not required to prove sexual penetration" should not have been included, because it misled the jury and "de-emphasized the significance that semen was not found." Defendant has not preserved this argument for review because it was not specifically alleged in his post-trial motion. A general objection to instructions, without specification, does not preserve the claimed error. *People v. Enoch* (1988), 122 Ill. 2d 176, 187, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

■ Even if it were considered on its merits, the trial court properly instructed the jury because a finding of semen is not an element of aggravated sexual assault (*People v. Harris* (1989), 187 Ill. App. 3d 832, 839-40, 543 N.E.2d 859). An essential element of aggravated criminal sexual assault is "sexual penetration." (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b).) The Criminal Code of 1961 defines "sexual penetration" as follows:

> " 'Sexual penetration' means any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).)

Additionally, whether sexual penetration occurred, whether semen was absent and whether the complainant's testimony was impeached were questions of fact for the trier of fact. However, the complainant never testified that the defendant ejaculated in her vagina. In fact, she testified that he only ejaculated in her mouth and that she spit it out. The trial court properly instructed the jury.

■ Defendant then argues that he was denied a fair trial when, in closing arguments, the assistant State's Attorney commented: (1)

that the defendant did not call his employer or individuals who accompanied him to the bar as witnesses; and (2) that the defendant was the driver of the maroon car. Additionally, the defendant contends that the prosecutor's comments "went beyond proper comments on the evils of crime" and that "the prosecutor misstated the law regarding outcry evidence." Again, this issue is waived because the post-trial motion did not set forth the specific remarks. See *People v. Harris* (1989), 187 Ill. App. 3d 832, 841, 543 N.E.2d 859; *People v. Thomas* (1983), 116 Ill. App. 3d 216, 219-20, 452 N.E.2d 77.

Defendant's post-trial motion only *generally* alleges that "the prosecutor made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudice and passions of the jury and to thereby prejudice defendant's right to a fair trial," but only *specifically* alleges that "the prosecutor made a prejudicial statement in closing argument that the semen test, to which the prosecutor stipulated, was an unreliable test where there was not evidence in the record as to the reliability." Thus, comments (1), (2) and defendant's contention that the assistant State's Attorney's comments "went beyond proper comments on the evils of crime" were not properly preserved for review.

Defendant's contention that the prosecutor misstated the law is waived because the defense attorney did not object at trial and did not specifically allege the claimed error in defendant's post-trial motion. Furthermore, we will not invoke the doctrine of plain error with respect to the claimed improper comments, because the evidence was not closely balanced and because the claimed errors were not of such magnitude that the defendant was denied a fair trial for the reasons stated above. *People v. Lucas* (1981), 88 Ill. 2d 245, 251, 430 N.E.2d 1091.

Defendant further argues that he was denied effective assistance of counsel, contending that the defense attorney failed to lay a proper foundation for Diane White's testimony that the complainant said that she was abducted by a white man and that the defense attorney failed to object to Officer Tamberlin's testimony regarding the "lewd" photos. We disagree. A claim of ineffective assistance of counsel will be sustained only if counsel has failed to perform in a reasonably effective manner and there is a reasonable probability that, but for this substandard performance, the outcome of the proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Defense counsel's performance must be viewed in light of his total performance and not just on the basis of isolated acts. (*People v. Ayala* (1986),

142 Ill. App. 3d 93, 99-100, 491 N.E.2d 154.) Upon review of the record, we find that the defense attorney represented the defendant effectively. He represented his client zealously. He objected to evidence and argued persuasively on the defendant's behalf. We do not believe the trial's outcome would have been different if defense counsel had laid a proper foundation. Additionally, the defense counsel's failure to object to evidence does not in and of itself establish defense counsel's incompetence. *People v. Murphy* (1978), 72 Ill. 2d 421, 438, 381 N.E.2d 677.

 Finally, defendant argues that the trial court abused its discretion by sentencing him to 10 year's imprisonment, contending that his co-defendants who pled guilty to aggravated criminal sexual assault, aggravated kidnapping and armed robbery also received concurrent 10-year sentences. Specifically, the defendant argues that his sentence should be less than his co-defendants because he was less culpable. We disagree. The trial court acted within the scope of its discretion because the sentence was within the guidelines prescribed by law. The defendant was convicted of a Class X felony and under the law he could have been sentenced to not less than six years and not more than 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3).) We are not persuaded that the trial court abused its discretion in sentencing the defendants differently because the court may have considered that the co-defendants pled guilty in determining their sentences.

For the reasons set forth above, defendant's conviction and sentence is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.