THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL ESCOBEDO, Defendant-Appellant.

First District (4th Division) No. 84—2620

Opinion filed December 31, 1986.—Rehearing denied January 30, 1987.

70

Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant, Daniel Escobedo, was convicted of two counts of indecent liberties with a child (Ill. Rev. Stat. 1983, ch. 38, pars. 11—4(a)(2), 11—4(a)(3)) and sentenced to concurrent terms of 12 years' imprisonment for each offense (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4)). Challenging the validity of his convictions, he raises the following issues for our review: (1) whether the State established his guilt beyond a reasonable doubt; (2) whether the prosecution's evidence prejudicially varied from the dates of the offenses set forth in the State's bill of particulars; (3) whether the defendant was denied a fair trial when a prospective juror who was peremptorily challenged by the defendant and excused by the trial court during *voir dire* served on the jury which found the defendant guilty of the charges; (4) whether the trial court erred in excluding testimony which defendant attempted to elicit in order to show that the complainant had told her mother the accusations against defendant were not true; (5) whether the defendant was denied a fair trial

by the State's cross-examination of defendant and the complainant's mother regarding the complainant's future contact with the defendant; (6) whether defendant was denied a fair trial by the prosecution's presentation of the complainant's father and stepmother as witnesses; (7) whether certain statements made by the State during closing argument denied defendant a fair trial; (8) whether the State's presentation of "other crimes" evidence denied defendant a fair trial. For the reasons set forth more fully below, we affirm defendant's convictions.

BACKGROUND

On January 10, 1984, defendant was charged in a two-count information with indecent liberties with K.S., the 12-year-old daughter of defendant's girlfriend. The information charged that both crimes occurred between December 13, 1982, and January 3, 1983. The State subsequently furnished defense counsel with a bill of particulars, identifying the dates of the crimes as "[a]pproximately December 27th or 28th 1982 in the evening hours" and "[a]pproximately January 4th or 5th 1983 in the evening hours." The State specified in the bill of particulars that the first incident involved an act of "oral copulation" and the second an act of "lewd fondling." Both offenses were specified to have occurred at 3845 South Wolcott in Chicago. Defendant raised the defense of alibi to the charges.

Defendant's trial began on September 24, 1984. Three witnesses were called by the prosecution: K.S., born February 15, 1970, the complaining witness; Debra, age 28, K.S.'s stepmother, who married K.S.'s father in April 1976; and Francis, age 34, the father of K.S.

The defense called 13 witnesses. Several of them testified regarding the defendant's presence during the time period in question. Some of them corroborated defendant's employment during this period. Two of them testified regarding their relationship with K.S. during the time period in question and thereafter. The last two defense witnesses were the defendant himself and Linda, the mother of K.S., who married the defendant after the filing of the charges which resulted in the convictions from which he now appeals. Defendant testified both that the alleged events never occurred and that he was elsewhere on the dates specified by the prosecution. Linda similarly testified both to facts inconsistent with her daughter's testimony and to facts consistent with the defendant's innocence.

On direct examination, K.S. testified that in December 1982, when she was 12 years old, she lived in Chicago with her natural mother, Linda, and was in the seventh grade at a Catholic school. K.S.'s mother was employed as a salesperson for Sears, Roebuck and

Company, and arrived home from work at about 6:30 p.m. one or two days a week, and at 9:30 p.m. at some other times. Defendant had been the boyfriend of K.S.'s mother for almost a year. On school days, K.S. would leave home at 8:15 a.m. and return home at 2:15 p.m. The defendant was there almost every day when she returned home from school, even when K.S.'s mother was not home. Sometimes K.S. and defendant would go to the show or for ice cream; once they went to a shooting range. K.S. would also sometimes go to her paternal grandmother's home after school and usually went there on weekends.

K.S. stated that toward the last week of December 1982, she and defendant were alone in the living room of her mother's home and were sitting on the couch watching television. It was after dinner time; K.S. stated that she normally ate dinner about 5:30 or 6 p.m. K.S. testified that defendant "talked to [her] about two other people that—and the things that he did to them. *** Then he talked to [her] about different things *** about sex and stuff." K.S. gave detailed testimony to the effect that the defendant then perpetrated an act of oral copulation. She stated that thereafter "it was sort of late. [She] didn't talk to him after that. [She] just went to bed ***." K.S. stated that her mother was not home at the time and that the incident took "about five to ten minutes." Although K.S. initially could not recall if the incident occurred in the last week of December, she then testified that it may have happened the last week in December and remembered that it happened on a weekday, not on the weekend.

K.S. also testified that during the first week of January 1983, she and defendant were alone in her mother's house, in the living room, and were sitting on the couch watching television after dinner. Defendant "told [her] that what it was is all right, what has happened before that and that there would be nothing wrong *** if [they] did it again." The witness testified to facts indicating that the defendant then committed an act of lewd fondling and that thereafter she "just left the room." She stated that she never did "these things with the [defendant] again." She did not know approximately when in the week the incident occurred, although she could recall that it was a school day.

K.S. stated that the day following the last encounter, she had a conversation with the defendant in the dining room of her mother's house and that no one else was there. K.S. told him "that [she] didn't want to do this anymore." She testified that she did not often speak to the defendant after the conversation.

In May 1983, K.S. left her mother's house to live with her father in Iowa. Her stepmother, Debra, was the first person whom she told,

in July 1983, what had transpired between herself and defendant. She did not tell anyone from January 1983 to July 1983 "[b]ecause [she] was afraid." K.S. stated that she was afraid "[b]ecause [defendant] always had a gun with him *** almost every day" she saw him. She saw him with the gun in the last week of December and the first week of January. She also testified that she was afraid to tell anyone because if she told her mother, her mother "wouldn't believe [K.S.] *** she would believe [the defendant]."

On cross-examination, K.S. stated that she never told her father anything about the incidents with defendant and her father never asked her about what happened. Her father did tell her that he was going to file another petition later in 1983 to obtain K.S.'s custody. K.S. testified that she wanted to remain in Iowa with her father and stepmother.

K.S. testified that she did not tell her natural mother or any family members what had happened. She also never told a very close girlfriend she had in Chicago, nor did she tell any of the nuns or teachers at her school. She stated that her natural mother and defendant had told her, after the incidents which formed the basis of the instant prosecutions, that "whatever they said in this house or do in this house, it shouldn't go any further than the house." She also testified that when she told her stepmother, Debra, about the incidents in July 1983, she did not describe all of the details of the assault to Debra and that she did not tell Debra the same things that she told the jury.

K.S. stated that when she lived in Chicago, she baby-sat for the children of her aunt (her father's sister). During the time period of December 1982 to January 1983, K.S. stated, she watched movies that were in her aunt's house on a video cassette recorder that was there. The movies "showed what people did" when they made love to one another. She did not tell her mother, her father, or her stepmother that she had watched the movies. She denied that her testimony was based upon the contents of these movies.

Although K.S. initially stated that defendant lived with her mother and herself during December 1982 and January 1983, she then stated that he did not live with them during this period. K.S. also testified that after the incidents, she went to defendant's apartment by herself to feed and play with the defendant's dog, and that the defendant was there, although there may have also been other persons there as well. She admitted that she was with the defendant after the incidents and explained that she "was afraid that if [she] told somebody that he'd be mad at [her]." She testified that she did not hide from the defendant, and that she did not run away from him.

K.S. testified that on February 27, 1984, her mother's birthday, she telephoned her mother and had a conversation with her. Although K.S. originally denied talking to her mother about the criminal charges against the defendant, when later asked if she had talked to her mother about the accusations that she made in front of the jury, K.S. answered, "Yes, I think I did." When questioned if she told her mother during that conversation that she was "very sorry" that she had "made these accusations," K.S. responded, "I don't remember saying that." When further questioned by defense counsel, "When you spoke to your mother on the phone on her birthday, February 27th, you talked to her about the charges you made against [defendant]," K.S. answered, "Yes."

K.S. could not remember if she went shopping at Water Tower Place with the defendant's sister, Hope Lee, and Lee's son on December 27, 1982, and did not know what time she came home. She also stated that she knew defendant was working at the Amphitheatre in November and December of 1982 and January of 1983, although she did not know the hours he was working. When asked whether she was aware that during that period of time, the defendant was working until 8 or 9 at night, K.S. responded, "No, no." There was no redirect or re-cross-examination of the complaining witness.

Debra, K.S.'s stepmother, testified that in mid-July 1983, she and K.S. had a conversation that was "somewhat lengthy and emotional" outside Debra's bedroom during which K.S. requested that Debra tell no one the contents of their discussion.

Frank, K.S.'s father, testified that K.S. never told him of the incidents with the defendant. He learned of the substance of the allegations from his wife, Debra, in late July or early August 1983. Frank stated that he signed a complaint against defendant in December 1983. He testified that he never telephoned his former wife, Linda, to inform her of K.S.'s accusations of defendant. He also stated that although he did not have custody of K.S. (as a result of the dissolution of his marriage to Linda), he was seeking custody for K.S.'s "mental health." Frank testified that he had not planned, prior to the fall of 1983, to seek a modification of K.S.'s custody. He also stated that he permitted K.S. to telephone her mother on February 27, 1984.

With the stipulation that defendant was born on December 4, 1937, the State rested its case. Defendant's motion for directed verdicts was denied.

Defendant's first witness was Wayne Haeffle, store manager for the concern at which defendant worked in December 1982 and January 1983. Haeffle testified that defendant had been employed by the

company, Fur-Real Limited, that defendant never had a gun, and that his hours were from 10 a.m. to 7 p.m., although occasionally it was necessary for defendant to work beyond 7 p.m. Defendant worked weekends, because they were always busy. If defendant "ever needed a day off, it would have been during the week." After reviewing business records to refresh his memory, Haeffle testified that he knew that defendant was working on December 27 and 28, 1982, and on January 4, 1983. Mitsuru Moreles, defendant's nephew who was a part-time employee, also worked on January 4, 1983.

Hope Lee, defendant's sister, testified that on December 27, 1982, she, her son, and K.S. went shopping at the Water Tower Place in downtown Chicago from 9:30 in the morning until 9:30 at night. Lee took K.S. home to her mother's house that night, and her mother was home to receive her. Lee stated that she had sales receipts to evidence the shopping excursion. Lee's daughter, Sherri, also stated that her brother, Lee, and K.S. went shopping at Water Tower Place on December 27, 1982, and that Sherri was with them when they took K.S. home around 9:30 in the evening. Sherri stated that K.S.'s mother was home at the time, and that Sherri spoke to her.

Mariano DiVittorio testified that one afternoon in December 1982, shortly before Christmas, he purchased a jacket from Fur-Real, in the Amphitheater, and saw the defendant working at that time. Renee and Philip DiVitorrio gave substantially similar testimony.

Irene Orlin stated that from November 1982 to March 1983, she was a bartender at a tavern at 3159 South Halsted Street. She stated that defendant would come to the bar when he left work, and would usually arrive between 9:30 p.m. and 9:45 p.m. He usually stayed with Irene as she closed up to make sure she did not have problems and that she would get out all right.

A close girl friend of K.S. when K.S. lived in Chicago testified that K.S. never told her that K.S. had been sexually molested or mistreated by defendant, nor did she either tell or indicate to the girl friend that she was frightened of the defendant. The girl friend's mother also testified at trial that K.S. never told her that she had any sexual problems with the defendant.

The defendant's nephew, Mitsuru Moreles, testified that he worked at the Amphitheatre for the Fur-Real Leather Company beginning in December 1982 and in January 1983 and part of February 1983. He stated that his uncle, the defendant, would pick him up, take him to work, and bring him home at night. The latest he and his uncle would ever leave would be 9 or 9:30 p.m., but regular leaving time was approximately 7, 7:30, or 8 p.m. Moreles stated that during the

Christmas rush everyone worked seven days a week.

Moreles' sister, Jodette, testified that defendant used to drive her brother home every day, and that she knew this because she would see them. She testified that they would always arrive before 10 p.m., and that sometimes they arrived earlier.

Defendant testified on his own behalf at trial and denied that he had committed the offenses of which he was accused, stating that they were "all lies." He stated that he lived at 3845 South Wolcott in Chicago with K.S.'s mother, Linda, whom he had married on March 29,1984. He never lived at the house when K.S. lived there, never had a key to the home at any time that K.S. lived there, and first obtained a key to the house in September 1983, after K.S. had left the residence.

After reviewing work records, defendant stated that he had a refreshed independent recollection of where he was on the dates specified in the information filed in the cause. On December 27, December 28, and January 4, he worked for Fur-Real Leather Limited at the Amphitheatre at 41st and Halsted in Chicago from 10 a.m. until 7 or 7:30 in the evening, or later, and drove his nephew home on those evenings.

Defendant stated that January 5, 1983, was his day off and that he spent all day with Linda. Defendant saw K.S. when she came in after school, put her books down, and went out again. Other than this brief period, she was not with defendant at all on January 5. Defendant testified that K.S. was not with him on December 27, December 28, or January 4.

Defendant testified that because Moreles did not own a car, defendant drove him home from work every night when they were both working and that they both worked about six nights out of seven. Defendant would then go to the tavern where Irene worked. Defendant stated that this was his regular course of conduct.

According to defendant, his relationship with K.S. in February and March 1983 was friendly. In February, March, and April 1983, he had occasions to be alone with her when he would drive her home from her grandmother's home. K.S. showed no hostility toward him on these occasions. In March or April, K.S. came alone to defendant's apartment periodically to see defendant's dog. K.S. would arrive without his knowledge that she was coming. Defendant would welcome her and let her play with the dog. She showed no signs of fear of him on these occasions.

Defendant stated that on February 27, 1984, K.S. telephoned her natural mother, Linda. Defendant was on the extension phone and

was able to recognize K.S.'s voice because he had spoken to her on the telephone at other times. Defendant remembered that in the conversation, K.S. told her mother, Linda, that she was sorry that she made the accusations against the defendant.

Defendant stated that he did not act as an unofficial security guard for the bartender at the tavern which he would frequent after work but simply helped the bartender close up and walked her to her car. He testified that he did not stay there every night until it closed.

Defendant stated that before taking the stand, he checked work records for only four specific dates: December 27, 1982, December 28, 1982, January 4, 1983, and January 5, 1983. While looking at work records, defendant testified from the stand that there was no page for Christmas, or for December 29, 1982, January 1, 1983, or January 2, 1983, and therefore he did not remember if he worked on any of those days.

Linda stated that in December 1982 and January 1983, she worked for Sears, Roebuck and Company. She usually worked from 8:30 a.m. to 5:30 p.m. three days a week, and from 11:30 a.m. to 8:30 p.m. two days a week. Usually, she would arrive home around 6:20 p.m. Twice a week she would arrive home after 8 p.m. On these latter days, K.S. would be at her grandmother's house. K.S. was never home alone. Linda stated that she was off on Wednesdays and often on Fridays.

Linda refreshed her recollection of her work schedule for the days specified in the State's bill of particulars against the defendant. She stated that on December 27, she worked from 9 a.m. until 6 p.m. She picked up K.S. from her grandmother's home and then went home. On December 28, which was a Tuesday, she worked from 12 p.m. to 9 p.m.

On January 4, 1983, Linda worked and was home by 6 p.m. Wednesday, January 5, was Linda's day off. Linda stated that defendant was not at her home alone with K.S. on that day. She stated that K.S. came home from school and did not stay in the house for a long period of time.

Linda also testified that she knew Hope Lee and Lee's son, and knew that Lee and her son took K.S. shopping in downtown Chicago on December 27, 1982. She stated that K.S. came home that night with Lee and her son and daughter about 9 p.m. or 9:30 p.m., and that K.S. had not been alone with defendant that day.

Linda stated that K.S.'s father and stepmother, Frank and Debra, never called Linda to inform her that anything was wrong with K.S. She testified that defendant was not alone in her house with K.S.

committing the offenses for which the defendant was charged, and that K.S. was lying about what had happened. She stated that defendant did not have a key to Linda's house prior to the time K.S. moved to Iowa, and that she allowed no one to be alone with K.S. in her house. Linda testified that she had not known that K.S. was watching pornographic movies while babysitting at the aunt's house.

Linda testified that on February 27, 1984, K.S. had a telephone conversation with Linda and defendant in Chicago and told Linda that she was sorry that she had made the accusations against the defendant.

Linda stated that she and K.S. had a close mother-and-daughter relationship and that there was nothing that would happen to K.S. that K.S. would not tell Linda. Linda also stated that K.S. was not afraid of defendant, and that on her own K.S. would go to defendant's apartment in March and April of 1983.

Thereafter the defense rested its case, and the State offered no evidence in rebuttal. The jury returned verdicts of guilty on both counts. The defendant was sentenced by the trial court to concurrent terms of 12 years' imprisonment with respect to each offense, and defendant's timely appeal followed.

OPINION

I

Defendant initially contends that the evidence was insufficient to establish his guilt beyond a reasonable doubt.

■■ ■ Where a defendant is charged with indecent liberties with a child and denies commission of the offense, the complainant's testimony "should be either clear and convincing or substantially corroborated. [Citation.]" (*People v. Coates* (1985), 109 Ill. 2d 431, 440, 488 N.E.2d 247, 250, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 729, 106 S. Ct. 1474.) This court must reverse the defendant's convictions " 'if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and create an abiding conviction that he is guilty of the crime charged.' " (*People v. Morgan* (1977), 69 Ill. 2d 200, 207, 370 N.E.2d 1063, 1066, quoting *People v. Nunes* (1964), 30 Ill. 2d 143, 146, 195 N.E.2d 706, 707.) Nevertheless, where the complainant's testimony is clear and convincing, this court cannot substitute its judgment for that of the jury, which had the opportunity to evaluate the credibility of the witnesses and evidence presented at trial. See *People v. Morgan* (1986), 112 Ill. 2d 111, 136, 492 N.E.2d 1303, 1313.

■ A complainant's testimony is clear and convincing if her

"story is consistent and *** discrepancies do not detract from its reasonableness." (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 140, 372 N.E.2d 1052, 1057; see also *People v. Palmer* (1984), 125 Ill. App. 3d 703, 710, 466 N.E.2d 640, 646, *appeal denied* (1984), 101 Ill. 2d 574.) Minor contradictions or inconsistencies that occur only affect the weight of the testimony which the trier of fact must evaluate and "do not, of themselves, create a reasonable doubt. [Citations.]" *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, 410, *cert. denied* (1985), 474 U.S. 908, 88 L. Ed. 2d 241, 106 S. Ct. 276; see also *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 1024, 486 N.E.2d 1297, 1301-02, *appeal denied* (1986), 111 Ill. 2d 593.

■ In the instant case, K.S.'s testimony at trial provided a detailed account of the sexual conduct to which she was subjected. Our review of the record indicates that her testimony in this regard was "plausible, straightforward and consistent." (*People v. Hunter* (1984), 129 Ill. App. 3d 262, 275, 472 N.E.2d 140, 142, *appeal denied* (1984), 101 Ill. 2d 571.) Indeed, defendant does not dispute on appeal that K.S.'s testimony with specific regard to the acts of molestation was consistent and believable.

Defendant claims instead that K.S.'s testimony was not clear and convincing because of inconsistencies or discrepancies regarding other aspects of K.S.'s testimony at trial. These alleged contradictions do not detract from the reasonableness of her statements at trial regarding the defendant's acts of indecent liberties.

For example, defendant points out that K.S. could not specify with certainty the dates, or days of the week, of the offenses. We do not attach particular significance to her inability to do so. During the cross-examination of K.S.'s father, defendant elicited the fact that K.S. had testified at the preliminary hearing to being molested by defendant on four to seven occasions, including the two incidents with which defendant was charged. Because of the apparent ongoing nature of the offenses, we believe that it is not unreasonable that the minor complainant would not be able to pinpoint the exact dates of the two incidents forming the basis of defendant's prosecution. The weight to be given to K.S.'s testimony in view of her inability to state the dates of the offenses with precision was for the jury to determine. See *People v. Steele* (1984), 124 Ill. App. 3d 761, 767, 464 N.E.2d 788, *appeal denied* (1984), 101 Ill. 2d 575.

■ Nor do we conclude that K.S.'s silence for several months following the events was sufficient to detract from the reasonableness of her testimony. K.S.'s delay in reporting the crimes is understandable in the circumstances of this case. She testified without contradiction

that she was instructed by her mother and defendant not to reveal things that were said or done in her mother's home and that she thought her mother would not believe her. She also stated that she believed that defendant would be angry with her if she told anyone and that he often had a gun in his possession when she saw him. Under these circumstances, it was not unreasonable for a 12-year-old girl to believe that, while she was living in Chicago, her disclosure of the crime to her mother, who was dating the defendant, or her father, friends, or teachers would eventually result in defendant's learning of her revelation and in his possible remonstration against her for the disclosure. Nor should this court be unmindful that the same, guilt, or embarrassment which a child suffers when victimized in the manner proved here excuses a delay in the minor's disclosure of such incidents. See generally *People v. Rassmussen* (1986), 143 Ill. App. 3d 11, 25-26, 492 N.E.2d 612, 620; *People v. Robinson* (1981), 94 Ill. App. 3d 304, 308, 418 N.E.2d 899, 902; *People v. McMillan* (1980), 86 Ill. App. 3d 208, 212, 407 N.E.2d 207, 211, *appeal denied* (1980), 81 Ill. 2d 604; *People v. Dorsey* (1965), 57 Ill. App. 2d 389, 395-96, 206 N.E.2d 762, 765.

■ Defendant contends that K.S.'s fear of him is undermined by her visits to his apartment in March and April 1983 because she was alone with him at these times. However, K.S. testified that on these occasions "there might have been other people" at defendant's apartment. Furthermore, K.S. stated at trial that she had been afraid that defendant would be angry with her if she disclosed what had happened; she did not testify that she was fearful of defendant himself after the offenses occurred. We also do not agree with defendant's contention that K.S.'s testimony was unbelievable because she testified that no further incidents took place after she advised him in January 1983 that she "didn't want to do this anymore." The record establishes that defendant committed these crimes with some degree of apparent cooperation of K.S. In view of these circumstances, it is not unreasonable that defendant would cease the misconduct when K.S. voiced her objection and indicated that she would not remain compliant.

Defendant further maintains that the affirmative evidence presented by his alibi witnesses and his work records was not contradicted by the State and raised a reasonable doubt of his guilt. Defendant's claim that he was elsewhere at the times K.S. said the crimes occurred was heard and rejected by the jury, however. The jury similarly disbelieved the defendant's theory that K.S. fabricated the charges in order to bolster her father's attempt to obtain custody of

K.S., as well as the testimony of defendant and K.S.'s natural mother to the effect that K.S. and defendant were never alone in the home.

■ Conflicts and contradictions in the testimony presented at trial involved questions of credibility which the trier of fact was in a superior position to resolve. (See, *e.g.*, *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402, 410.) "[T]he State's burden of proof at trial is to prove guilt beyond a reasonable doubt, not beyond any possibility of a doubt [and] 'the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' " (*People v. Madej* (1985), 106 Ill. 2d 201, 218, 478 N.E.2d 392, 399, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 268, quoting *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605, 608.) Our careful scrutiny of the evidence adduced at trial reveals no basis for overturning the jury's verdict on the ground that defendant was not found guilty beyond a reasonable doubt. We conclude that K.S.'s testimony was sufficiently clear and convincing for the trier of fact to find the defendant guilty of indecent liberties beyond a reasonable doubt.

## II

Defendant asserts that he was prejudiced by the variance between the State's bill of particulars and its evidence presented at trial. Specifically, he contends that he was misled in the preparation of his alibi defense by relying on the State's representation that the offenses occurred on "[a]pproximately December 27th or 28th, 1982" and "[a]pproximately January 4th or 5th, 1983," where the State's evidence was unrestricted to the last week of December 1982 and the first week of January 1983. He also maintains that the trial court committed reversible error when it permitted the State to present evidence that the offenses occurred on dates other than those specified in the State's bill of particulars.

■ A minor variance between the State's proof at trial and the information provided by a bill of particulars is generally not considered reversible error unless the date is an essential element of the crime or relates to the running of the statute of limitations. (*People v. Chrisos* (1986), 142 Ill. App. 3d 747, 751, 492 N.E.2d 216, 219.) An exception to this general rule has been recognized "where the inconsistency is so substantial that it misled the defendant in the preparation of his defense [citations], or where an alibi defense has been used to counter the time or date specified in the bill of particulars, since in such a case the defendant may have been misled into failing to gather evidence and witnesses regarding the time and date the State actually

proved. [Citations.]" *People v. Steele* (1984), 124 Ill. App. 3d 761, 766, 464 N.E.2d 788, 792; see also *People v. Eng* (1985), 138 Ill. App. 3d 281, 286, 485 N.E.2d 1222, 1226; *People v. Noll* (1982), 109 Ill. App. 3d 306, 308, 440 N.E.2d 335, 337, *appeal denied* (1982), 92 Ill. 2d 571.

The date of the crime is not an essential ingredient of the offense of indecent liberties with a child (see *People v. Steele* (1984), 124 Ill. App. 3d 761, 766, 464 N.E.2d 788), and compliance with the statute of limitations is not questioned here. Defendant argues that he was prejudiced by the variance between the dates specified in the State's bill of particulars and the proof presented by the State at trial.

■ The information charged that defendant committed the offenses specified between December 13, 1982, and January 3, 1983. The State's bill of particulars identified the dates of the crimes as "[a]pproximately December 27th or 28th 1982 in the evening hours," and "[a]pproximately January 4th or 5th 1983 in the evening hours." K.S. testified that the first incident occurred after Christmas, "toward the last week of December," on a weekday (*i.e.*, Monday, December 27 to Friday, December 31). She stated that the second encounter took place during the first week of January on a school day (*i.e.*, Monday, January 3 to Friday, January 7).

Defendant's sister and niece testified that K.S. had gone shopping with them on December 27, 1982. Defendant's supervisor at his place of employment during the relevant period testified that defendant worked on December 27 and 28, as well as on January 4. Defendant's remaining alibi evidence was not restricted to the four dates specified in the State's bill of particulars, however. Defendant testified that his "regular course of conduct" in December 1982 through February 1983 was to work from 10 a.m. until at least 7 p.m., drive his nephew home, and then aid in the closing of a tavern. Defendant's niece and nephew corroborated defendant's testimony that he was working in December 1982 through February 1983 and regarding his "regular course of conduct" during this period. The bartender whom defendant aided in closing the establishment similarly testified to defendant's normal pattern of behavior during the months of December 1982 and January 1983. Also, three witnesses testified on defendant's behalf that they saw defendant at work before December 25, 1982, a period of time not encompassed by the bill of particulars.

Under these circumstances, we are unable to conclude that the State misled defendant in the preparation of his defense or that any assumed discrepancy between the State's proof at trial and the dates specified in the bill of particulars amounted to reversible error. The record indicates that defendant's work records admitted at trial cov-

ered numerous days from December 6, 1983, to January 7, 1984. Furthermore, defendant's work records did not account for his whereabouts after 7 p.m. or 8 p.m. on the days he worked, although the State's bill of particulars specified that the offenses occurred "in the evening hours," and although K.S. testified that the incidents took place "after suppertime" and that after one of the instances she "went to bed." In addition, defendant presented testimony from five individuals, including himself, regarding his "regular course of conduct" during the months of December 1982 and January 1983. Based upon this record, we find defendant's arguments in this regard insufficient ground to reverse his convictions.

### III

Defendant maintains that his convictions are vitiated by the service of a juror whom defense counsel had peremptorily challenged and the trial court had excused. Defendant asserts that the participation of an excused juror in the jury's deliberations deprived him of his right to an impartial jury and that he and his attorneys were not aware of the juror's participation until the record on appeal was reviewed. The State responds that defendant has waived appellate review of this issue by failing to raise it before the trial court.

One of the prospective jurors called during *voir dire* in the instant cause was a Mrs. Edith Anderson. The record indicates that the trial court initially conducted *voir dire* by questioning a panel of 12 prospective jurors who were seated in the jury box. During this questioning, Mrs. Anderson stated that she was employed as a word processor by a law firm that handled no criminal law cases and was divorced with three adult children, two of whom lived with their father. At the end of preliminary questioning of the panel, the prosecutor announced that the State would accept the entire panel. The court then addressed defense counsel, who responded that the defense would peremptorily challenge Mrs. Anderson and Miss Wadas. The trial court directed these two individuals to "step out of the box."

During the course of the court's questioning of subsequent prospective jurors, a juror who identified herself as "Edith Anderson" mentioned that she had an error on her questionnaire in that she failed to specify that she had been a robbery victim "three times over the past 20 years." When asked by the trial court if the incidents "would affect [her] ability to serve," she responded that they would not. The trial court resumed *voir dire* of additional prospective jurors. It appears from the record, however, that although Mrs. Anderson was peremptorily challenged by the defendant and excused by the

trial court, she nevertheless served on the jury and was selected as the foreperson.

■■■ Although "the guaranty of trial by jury insures to a defendant in a criminal case the right to have the facts in controversy determined by twelve impartial jurors [citation] *** this rule does not relieve a defendant of his duty to ascertain whether impartiality exists." (*People v. Ward* (1965), 32 Ill. 2d 253, 258-59, 204 N.E.2d 741, 744, *cert. denied* (1966), 384 U.S. 1022, 16 L. Ed. 2d 1026, 86 S. Ct. 1947.) Consequently, it is well established that a defendant may not acquiesce in improprieties occurring during the selection of jurors "without objection and afterwards seek to reverse his conviction by reason of those same irregularities." (*People v. Ford* (1960), 19 Ill. 2d 466, 479, 168 N.E.2d 33, 40, *cert. denied* (1960), 364 U.S. 848, 5 L. Ed. 2d 72, 81 S. Ct. 93; see *People v. Heine* (1941), 377 Ill. 134, 136, 35 N.E.2d 323, 324; see also *People v. Silagy* (1984), 101 Ill. 2d 147, 171, 461 N.E.2d 415, 427, *cert. denied* (1984), 469 U.S. 873, 83 L. Ed. 2d 156, 105 S. Ct. 227.) Other jurisdictions which have considered challenges to verdicts rendered by a jury containing a peremptorily challenged and excused juror have usually held that such an irregularity must be brought to the trial court's attention before the jury is sworn, reasoning that the parties must exercise due diligence to ensure that the jury as impaneled does not consist of a juror who was both challenged and excused. See, *e.g., Vaughn v. State* (1985), 173 Ga. App. 716, 327 S.E.2d 747; *King v. State Roads Commission of State Highway Administration* (1979), 284 Md. 368, 396 A.2d 267; *Lee v. Colson* (1976), 277 Md. 599, 356 A.2d 558; *Vaccaro v. Caple* (1976), 33 Md. App. 413, 365 A.2d 47; *Coburn v. State* (Tex. App. 1985), 688 S.W.2d 214; see also *State v. Thompson* (1949), 68 Ariz. 386, 206 P.2d 1037; *Lee v. Baltimore Hotel Co.* (1939), 345 Mo. 458, 136 S.W.2d 695.

■■ After consideration of the jurisprudence of this State and other jurisdictions, we conclude that the defendant had a duty to ascertain whether the jury as impaneled was properly selected and to advise the trial court of any infirmity in the jury as sworn at the earliest opportunity. Regardless of whether the challenged prospective juror remained with the selected jurors during the court's *voir dire* of remaining venire and was therefore visible for defense to recognize, there is nothing in the record which indicates that defendant or his attorney was prevented from viewing Mrs. Anderson as she participated in the jury's hearing of the evidence at trial. Indeed, before the jury's verdict was announced, Mrs. Anderson advised the trial court that one of the verdict forms had been mistakenly signed. Under the circumstances of this case, we determine that defendant waived re-

view of this issue by neglecting to recognize and call to the court's attention the fact that a prospective juror whom defendant had peremptorily challenged was in fact in service upon the jury.

■■■ Based upon the record presently before us, we also are unable to hold that any assumed error would require reversal in the instant cause. Mrs. Anderson was questioned by the trial court judge and found qualified to serve upon the jury. Her service was excused when defense peremptorily challenged her participation as a juror. As a result, although Mrs. Anderson should not have served upon the jury because she was peremptorily challenged and excused by the trial court, her service was not affected by any circumstance which would have justified her excusal for cause; defendant does not disagree that she was otherwise qualified to serve upon the jury. In addition, there is nothing here to demonstrate or imply that Mrs. Anderson was biased or that her service upon the jury was fraudulent. Since there is no such proof, we cannot conclude on this record that defendant was deprived of a fair trial because of her deliberation as a member of the jury which convicted the defendant. See *People v. Ward* (1965), 32 Ill. 2d 253, 259, 204 N.E.2d 741, 745; see generally, *e.g.*, *People v. Collins* (1985), 106 Ill. 2d 237, 271-72, 274, 478 N.E.2d 267, 282, 283, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 429, 475 N.E.2d 840, 847, *cert. denied* (1985), 474 U.S. 883, 88 L. Ed. 2d 173, 106 S. Ct. 204; *cf. People v. Moss* (1985), 108 Ill. 2d 270, 276, 483 N.E.2d 1252, 1255.

## IV

Defendant argues the trial court erred in excluding testimony that on February 27, 1984, K.S. told her mother she had falsely accused the defendant.

During the cross-examination of K.S., defense counsel established that February 27, 1984, was the birthday of K.S.'s natural mother, Linda, and that K.S. had telephoned her mother in Chicago. K.S. testified that during this conversation, she and Linda discussed K.S.'s living with her father and the charges against defendant. K.S. could not recall telling her mother that she was "very sorry" that she had made the accusations against defendant. Defense counsel further elicited that K.S. did not know what it meant to make "false charges" or "false accusations," but knew what "lies" were.

Defendant testified that K.S. telephoned her mother on February 27, 1984. The State objected to testimony pertaining to the substance of this conversation. After reviewing the transcript of K.S.'s cross-examination, the trial court determined that defendant and Linda could

testify that they heard K.S. say that she was sorry she had made the accusations. However, the trial court ruled that no foundation had been established for testimony that K.S. had said that the accusations were false.

▪▪ The impeachment of a witness with a prior inconsistent statement must generally be preceded by directing the witness during cross-examination to the time, place, circumstances, and substance of the inconsistent statement. (*People v. Cobb* (1983), 97 Ill. 2d 465, 479, 455 N.E.2d 31, 37.) This foundation alerts the witness to the statement in order to prevent unfair surprise and to enable the witness to explain the prior statement. *People v. Bradford* (1985), 106 Ill. 2d 492, 500-01, 478 N.E.2d 1341, 1344; *People v. Sanders* (1974), 56 Ill. 2d 241, 251, 306 N.E.2d 865, 870-71; *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178.

▪▪ In the instant case, the trial court properly allowed defendant and K.S.'s mother to testify that they heard K.S. state that she was sorry she had brought the charges against the defendant. However, despite an extensive cross-examination of K.S., defense counsel did not alert K.S. to the statement attributed to her that the charges were false. (See *People v. Kubat* (1983), 94 Ill. 2d 437, 496, 447 N.E.2d 247, 273, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199; *People v. Rodgers* (1972), 53 Ill. 2d 207, 215, 290 N.E.2d 251, 255.) As the trial court judge correctly observed, "A person could well be sorry [he] brought charges, even though the charges were true." K.S. was only asked whether she understood the terms "lies," "false charges," and "false accusations." In our view, this foundation "was too general and inadequate" to allow specific impeachment testimony regarding whether K.S. had stated that the charges against defendant were false. (See, *e.g., People v. Smith* (1980), 78 Ill. 2d 298, 305, 399 N.E.2d 1289, 1293.) Because a proper foundation was not established, we conclude that the trial court did not err in excluding this impeachment testimony.

▪▪ Defendant also asserts that testimony of K.S.'s alleged statement that she had lied regarding defendant's conduct toward her prior to trial was independently admissible without the foundation necessary to elicit proof of a prior inconsistent statement. This claim is waived upon review, however, because defendant never argued to the trial court that there existed such an independent basis for admission of this testimony. (See, *e.g., People v. Thomas* (1983), 116 Ill. App. 3d 216, 220-21, 452 N.E.2d 77, 80-81.) Our analysis of the authorities cited by defendant to support his claim of independent admissibility finds no basis for the defendant's argument. Each decision

involved the question of whether the trial court impermissibly limited the scope of the defendant's cross-examination of a State's witness (for example to show bias or motive to testify falsely), an issue not raised in the case at bar. See *People v. Gorney* (1985), 107 Ill. 2d 53, 481 N.E.2d 673; *People v. DeSavieu* (1983), 120 Ill. App. 3d 420, 458 N.E.2d 504, *appeal denied* (1984), 99 Ill. 2d 531; *People v. Howard* (1983), 113 Ill. App. 3d 380, 447 N.E.2d 473, *appeal denied* (1984), 99 Ill. 2d 532; see also Ill Rev. Stat. 1985, ch. 38, par. 115—10.1 (recorded, signed, or sworn prior inconsistent statement admissible as exception to hearsay rule).

## V

Defendant next contends that he was denied a fair trial when the State raised questions on cross-examination, and made references during the State's closing argument, regarding the defendant's future contact with K.S. Defendant argues that the cumulatively prejudicial impact of the State's asserted misconduct entitles him to a new trial.

During the cross-examination of K.S.'s mother, the prosecutor established that K.S.'s mother loved defendant, had no reason to fear him, and would continue to seek K.S.'s custody from her former husband. The prosecutor then asked, "So, if you were to regain custody of [K.S.], you would see nothing wrong with [K.S.] *** [l]iving with [defendant]?" Defendant's objection to the question was sustained and the jury instructed to disregard it. The State also attempted similar questioning during its cross-examination of the defendant. Defense counsel object to the prosecutor's question, and the jury was instructed to disregard it.

Finally, during the State's rebuttal closing argument, the prosecutor stated: "One last comment about the mother and her sensitivity. You heard what she said, what her position is now. Even if she sincerely believes that the Defendant never did this, she feels there's nothing wrong whatsoever with leaving [K.S.] alone with the Defendant now. Now, imagine that. Even if it didn't happen, she thinks psychologically, it would be fine for [K.S.], every day to come home from school and open that door and know that the Defendant is going to be standing there." Defendant's objection to the argument was sustained. The trial court instructed the jury, before it retired to deliberate, that it "should disregard questions and exhibits which were withdrawn or to which objections were sustained."

The State responds that the prosecutor's cross-examinations and closing argument challenged here were proper and consequently do not amount to error. Assuming *arguendo* that the State's conduct

was improper, we cannot say that the claimed errors cumulatively deprived defendant of a fair trial. Errors of the nature of which defendant complains do not require reversal where, as here, the trial court admonishes the jury, both at the time the evidence is presented and in its final instruction, to disregard such evidence. (See, *e.g.*, *People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746, 750; *People v. Baptist* (1979), 76 Ill. 2d 19, 28-30, 389 N.E.2d 1200, 1205-06.) Based upon this record, we are unable to conclude that the trial court abused its discretion when it determined that the State's behavior did not influence the jury to convict the defendant simply as a means of ensuring that K.S.'s mother would be precluded from retaining K.S.'s custody or some other related basis. (See, *e.g.*, *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 426-27, 475 N.E.2d 840, 848.) Nor can we conclude that the State's conduct was of such a flagrant and inflammatory character that it destroyed the basic fairness of the trial itself. See, *e.g.*, *People v. Ray* (1984), 126 Ill. App. 3d 656, 663-65, 467 N.E.2d 1078, 1083-84.

## VI

■■ Defendant argues that he was denied a fair trial when the State called K.S.'s father and stepmother as witnesses. Defendant contends that neither of these witnesses testified to what occurred between defendant and K.S. in December 1982 or January 1983 and that their presentation to the jury was an improper attempt to appeal to the jurors' emotions. Defendant did not object at trial to the presentation of these witnesses and failed to include this issue in his written motion for a new trial, however. As a result the question is not properly raised upon review. See, *e.g.*, *People v. Friesland* (1985), 109 Ill. 2d 369, 374, 488 N.E.2d 261, 262.

## VII

Defendant claims that he was denied a fair trial when the prosecutor, during his closing argument, allegedly asserted facts not in evidence. Specifically, defendant argues that the assistant State's Attorney improperly created an additional reason for K.S.'s delay in reporting defendant's misconduct to which K.S. had not testified by asserting that K.S. had not complained about the crime in Illinois because there was "nobody she could trust." Defendant further contends that the prosecutor's description of the circumstances surrounding K.S.'s revelation to her stepmother was not based on the actual evidence.

■■ Defendant concedes that no objection was interposed to the

State's closing argument. However, defendant maintains that his attorney's prior objections to the State's arguments as not based upon the evidence had been consistently overruled by the trial court's admonition that it was for the jury to determine what the evidence was. Thus, defendant reasons, counsel need not have raised an objection to this particular argument. We disagree. The Illinois Supreme Court has held that if a defendant does not object to the prosecutor's argument, any error is "considered waived unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." *People v. Albanese* (1984), 104 Ill. 2d 504, 518, 473 N.E.2d 1246, 1251, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.

 █ A prosecutor may base his closing argument both on the proof adduced at trial and the reasonable inferences flowing from such evidence. (*People v. Collins* (1985), 106 Ill. 2d 237, 277, 478 N.E.2d 267, 285, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Owens* (1984), 102 Ill. 2d 88, 105, 464 N.E.2d 261, 268, *cert. denied* (1985), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 362.) Our review of the record indicates that the portions of the assistant State's Attorney's closing argument which defendant challenges here were proper comment upon evidence admitted at trial. It was reasonable for the prosecution to argue that K.S. felt that she could not "trust" her mother, friends, and teachers with the disclosure of defendant's misconduct, since such a revelation to these people might result in defendant learning of her report and becoming angry with K.S. It was also reasonable to argue that K.S. trusted her stepmother, based upon the testimony that K.S. revealed defendant's crime solely to her stepmother during an emotional discussion in which she directed her stepmother not to repeat this information. The prosecutor's argument that K.S. "broke down crying" and "cried for a long time" was proper comment on testimony that K.S. "cried hysterically" during a "somewhat lengthy and emotional" conversation with her stepmother. Finally, it was logical to infer that K.S. spoke to her stepmother "in the middle of the night" based upon the testimony that the conversation occurred outside K.S.'s stepmother's bedroom and the evidence that K.S.'s stepmother reported this discussion to K.S.'s father late one evening. Furthermore we cannot say on this record that any assumed misstatement of the evidence presented at trial was so inflammatory or flagrant to require a new trial.

## VIII
Defendant claims that he was denied a fair trial when the prose-

cution elicited K.S.'s testimony that defendant had committed other sexual crimes for which he was not charged. K.S. testified that prior to the December 1982 incident, defendant told her "that it was all right and that he always did it with these two other girls." K.S. further testified that prior to the January 1983 incident, defendant told her that "what has happened before" was "all right" and there "would be nothing wrong *** if [they] did it again." Defendant contends that K.S.'s testimony that he had engaged in sexual acts with other girls was improper "other crimes" evidence.

■■ As a general rule, evidence that a defendant engaged in other crimes for which he is not charged is considered irrelevant and prejudicial because of its tendency to persuade the jury to convict the defendant "only because it feels he or she is a bad person deserving punishment." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242.) However, such "other crimes" evidence is admissible if it is offered to prove "any fact material to the prosecution" other than the defendant's propensity to commit crime. *People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840, 860, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666; see also *People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145; *People v. Hendricks* (1986), 145 Ill. App. 3d 71, 105, 495 N.E.2d 85, 108-09.

■■ In our opinion, testimony that defendant persuaded K.S. to participate in these crimes by advising her that there was "nothing wrong" with such conduct and that it was "all right" and had been previously accomplished with "two other girls" was permissible to "explain and lend credence to the otherwise unrealistic ease" with which defendant obtained K.S.'s repeated assistance in the commission of these crimes. (See *People v. Cole* (1963), 29 Ill. 2d 501, 505, 194 N.E.2d 269, 271; see also *People v. Romero* (1977), 66 Ill. 2d 325, 330-31, 362 N.E.2d 288, 290.) We conclude that no error occurred in the introduction of this evidence.

For the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN, P.J., and JIGANTI, J., concur.